ANIMAL PROTECTION INSTITUTE OF AMERICA, et al., Petitioners,

v.

Robert A. MOSBACHER, et al., Respondents,

and

John G. Shedd Aquarium, and American Association of Zoological Parks and Aquariums, Intervenor–Respondents.

INTERNATIONAL WILDLIFE COALITION, et al., Petitioners,

v.

Barbara H. FRANKLIN, and William W. Fox, Jr., Respondents,

and

John G. Shedd Aquarium, Intervenor–Respondent.

Civ. A. Nos. 89–1696, 92–0223.

United States District Court, District of Columbia.

July 31, 1992.

---

Howard Irving Fox, Sierra Club Legal Defense Fund, Washington, D.C., for plaintiffs International Wildlife Coalition, Animal Protection Institute of America, Greenpeace U.S.A., American Humane Ass'n, Humane Soc. of U.S., Fund for Animals, Inc., Sea Shepherd Conservation Soc., Whale and Dolphin Conservation Soc., Midwest U.S.A. Whale Protection Federation and Cetacean Soc. Intern.

Christiana P. Perry, Diane M. Connolly, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., for defendants William W. Fox, Jr., Barbara Franklin, Robert A. Mosbacher, James W. Brennan.

John Andrews Hodges, Wiley, Rein & Fielding, Washington, D.C., for intervenor-defendant John G. Shedd Aquarium.

Ira T. Kasdan, James Lowell Komie, Ginsburg, Feldman & Bress, Washington, D.C., for amicus curiae American Ass'n of Zoological Parks and Aquariums.

Karen Leta Stefflre, Patterson, Belknap, Webb & Tyler, New York City, for amicus curiae New York Zoological Soc.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

These cases, each challenging a permit issued by the Secretary of Commerce ("Secretary") for the importation of certain marine mammals, are before the Court on cross-motions for summary judgment. In the first case, *Animal Protection Institute, et al., v. Franklin,* Civil Action No. 89–1696, (the "API Case"), the petitioners, each of whom may be generically described as an organization for the protection of wildlife, seek invalidation of a permit issued by the respondent Secretary to the intervenor-respondent John G. Shedd Aquarium ("Shedd") on April 28, 1989 for the importation from Japan of six false killer whales, *pseudorca crassidens,* for the purpose of public display at the Shedd Aquarium in Chicago.

In the second case, *International Wildlife Coalition v. Schnabel,* Civil Action No. 92–0223, (the "IWC Case"), the petitioners, similar organizations (some of whom are also party to the API Case), seek invalidation of a permit issued by the respondent Secretary to the intervenor-respondent, again Shedd, on November 29, 1991 for the importation from Canada of four yet-to-be-captured beluga whales, *delphinapterus leucas,* for the purpose of public display at the same Shedd Aquarium.[1]

In both the API Case and the IWC Case (collectively, the "Whales Cases") the petitioners contend that the Secretary violated the requirements of the Marine Mammal Protection Act of 1972 ("MMPA" or the "Act"), 16 U.S.C. § 1361, *et seq.,* by failing to determine that the method by which the whales were or will be reduced to captivity is consistent with the MMPA's provisions, and also by failing to ascertain the "optimum sustainable population" ("OSP") of the species of whale involved, before issuing the permits. The API Case petitioners make the additional argument that the Secretary violated the MMPA by failing to determine that the animals to be imported were not pregnant, nursing or underage at the time of taking, or taken in a manner deemed inhumane by the Secretary. Petitioners contend that the foregoing omissions or oversights render the issuance of the permits invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), as being "not in accordance with law" or, alternatively, "arbitrary and capricious," and thus an abuse of discretion. Because of the substantial identity of the parties and similarity of the facts of each case, and because the same legal issues are involved in each, the Whales Cases were consolidated for all purposes on April 29, 1992.

### I.

■ On June 12, 1992, however, the Supreme Court issued its decision in *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351, 60 U.S.L.W. 4495, (*"Defenders"*), holding that certain plaintiff environmental groups did not have standing to challenge a rule promulgated by the Secretary of the Interior interpreting § 7(a)(2) of the Endangered Species Act of 1973, ("ESA"), 16 U.S.C. § 1536. The decision belatedly raised the question of whether the Whales Cases petitioners have standing to bring the instant actions.[2]

1. Specifically, in the API Case the petitioners are: Animal Protection Institute of America, Inc.; International Wildlife Coalition; Midwest U.S.A. Whale Protection Federation; Humane Society of the United States; Greenpeace USA; Cetacean Society International; Sea Shepherd Conservation Society; and the American Humane Association. In the IWC Case the petitioners are: International Wildlife Coalition; Animal Protection Institute of America, Inc.; Greenpeace; American Humane Association; Humane Society of the United States; The Fund for Animals, Inc.; Sea Shepherd Conservation Society; and Whale and Dolphin Conservation Society.

2. Section 7(a)(2) of the ESA, the substantive statute at issue in *Defenders,* required that federal agencies authorizing, funding or carrying out various programs "consult" with the Secretary of the Interior to ensure that they were:

> not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which

The Supreme Court reiterated the familiar three-part test for standing in deciding *Defenders:*

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed" by a favorable decision.

*Defenders,* —— U.S. at ——, 112 S.Ct. at 2136. A plaintiff invoking federal jurisdiction, the Supreme Court said, bears the burden of demonstrating these elements with "specific facts," not "mere allegations," observing, moreover, that a plaintiff's burden of establishing standing is "substantially more difficult" to meet when the plaintiff is "not himself the object of the government action or inaction he challenges...." *Id.*

Just a few terms ago, however, the Supreme Court held that "whale-watchers," as such and without more, allege a sufficient "injury in fact" to satisfy that element of the test, in that whale-watching and studying would be adversely affected by a continuation of the whale "harvesting" they sought to curtail. *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986). Several members of the petitioner organizations in the Whales Cases here also claim to be "whale-watchers,"[3] and they contend that their opportunities to view these creatures in the wild will be diminished to the extent any are captured for exhibition at the Shedd Aquarium, notwithstanding an undetermined number of them remain at large.[4]

Yet the *Defenders* decision made clear that while observing an animal species, even for purely aesthetic purposes, is undeniably a "cognizable" interest for the purpose of standing, the "injury in fact" test requires more. Specifically, the Court held that the plaintiffs in *Defenders* had to submit evidence that one or more of their members would be "directly" affected apart from their "special interest" in the subject. Op., at 176. Applying this refinement of the test, the Supreme Court proceeded to find that the plaintiffs in *Defenders* lacked standing, in part, because the affidavits upon which they relied expressed only vague and indefinite intentions of the affiants for future observation of the endangered crocodiles, elephants and leopards, with which they were concerned.[5] Such "'some day' intentions," the Supreme Court stated, "without any description of concrete plans, or indeed even any specification of when the some day will be ... do not support a finding of the 'actual or

---

is determined by the Secretary, after consultation as appropriate with affected States, to be critical.

16 U.S.C. § 1536(a)(2). The Departments of Interior and Commerce initially promulgated a joint regulation in 1978 stating that the obligations imposed by this section extended to actions taken in foreign nations. A revised joint regulation, in 1983, reinterpreted that section as requiring consultation only with respect to actions that were *not* taken abroad, and the plaintiffs in *Defenders* sought a declaratory judgment and an injunction reviving the original interpretation.

**3.** *See* declarations of Anne Doncaster and Edward Morlan (in the IWC Case) and Nancy Daves (in the API Case). While these declarants are not themselves named plaintiffs, neither were the affiants in *Defenders.*

**4.** The Court is unwilling to conclude, as defendants urge, that *Japan Whaling* does not apply here, even for standing purposes, because "harvesting" is intrinsically more injurious to the population of the species than is a capture for "public display." The proposition assumes that the latter represents a *de minimis* reduction of the species, which may not necessarily be the case, and is, moreover, precisely the kind of finding that petitioners here claim cannot be made without a formal OSP determination.

**5.** One affiant, when pressed at deposition for *when* she expected to resume her observations, said: "I don't know [when].... Not next year.... In the future." *Id.,* —— U.S. at ——, 112 S.Ct. at 2138.

imminent' injury that our cases require." *Id.*, —— U.S. at ——, 112 S.Ct. at 2138.

While the Supreme Court in *Defenders* admitted that the "imminence" [of such an injury] is a "somewhat elastic concept," it stressed that the judicial requirement for imminence was designed "to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.*, at n. 2. The Supreme Court's concern in *Defenders* was that the affiants' intentions to return to the areas at question were sufficiently amorphous as to mean "nothing more than 'in this lifetime.'" *Id.*, at n. 2.

In contrast to the plaintiffs in *Defenders*, each relevant declarant in the Whales Cases has committed to a *specific* time frame in which he or she plans to visit the areas in which the false killer whales and belugas are likely to be encountered. Doncaster plans to watch belugas "this summer;" Morlan plans to take students to watch the belugas in the "summers of 1993 and 1994;" and Nancy Daves plans to visit Japan to watch the false killer whales "this summer."

Wherever a precise line of "imminence" may be drawn between events scheduled, or expected to occur "soon," and those too speculative to inspire confidence in their occurring at all, a cautious reading of *Defenders* counsels that concrete plans for actions to be taken "this summer" should fall on the positive side of the spectrum, militating toward a finding of standing, for these Whales Cases petitioners, at least with respect to the first part of the standing test. While the outcome is by no means certain, the Court concludes that petitioners in the Whales Cases (or at least some of the people they represent) meet the test and have thus borne the burden of establishing actual or imminent injury in fact.

In the Whales Cases, unlike *Defenders*, the second and third parts of the standing analysis respecting causation and redressability actually coalesce in petitioners' favor.[6] More precisely, a decision granting the relief they ask will both eliminate the source of the harm they fear and prevent the injury from occurring; an invalidation of the permits will prevent the importation of the whales, and whales that cannot be imported are unlikely to be captured, at least for delivery to Shedd.[7] Consequently, the Court concludes (although not without certain misgivings previously expressed), that petitioners in the Whales Cases have standing to oblige the Court to proceed to address the merits of their claims.

## II.

Title 16, U.S.C., § 1371, entitled "Moratorium on Taking and Importing Marine Mammals and Marine Animal Products," states in relevant part in subparagraph (a):

> There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, ... during which time no permit may be issued for the taking of any marine mammal and no marine mammal product may be imported into the United States except in the following cases:

---

6. The action that the plaintiffs were trying to force in *Defenders* was "consultation" (between the Secretary of the Interior and the agencies funding certain overseas projects, alleged to jeopardize already endangered species). Even were the desired consultation to have occurred, however, the funding agencies would have been under no obligation to take the Secretary's advice, and thus a judicial decision ordering a consultation gave no assurance of having any practical effect in relieving the plaintiffs' distress. In addition, the U.S. funding agencies in *Defenders* contributed only a small fraction of the total funding for the overseas projects involved; the withdrawal of their support would not have resulted in the projects' termination.

7. Although Japan and Canada might theoretically export their whales elsewhere, the diminution in demand would correlate directly to the diminution in harm to plaintiffs. The fact that the harm may not be completely forestalled is irrelevant, for "redressability," as a function of standing, requires only significant mitigation, not complete cessation, of injury. *See, e.g., International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 n. 27 (D.C.Cir.1983); *Student Public Interest Research Group v. Georgia-Pacific Corp.*, 615 F.Supp. 1419, 1424 (D.N.J. 1985) ("Plaintiffs need not show that this lawsuit will restore the Delaware to a pristine state, only that defendant's role in polluting the river may be lessened thereby.").

(1) Consistent with the provisions of section 1374 of this title, permits may be issued by the Secretary for taking and importation for purposes of scientific research, public display, or enhancing the survival or recovery of a species or stock if—

(A) the taking proposed in the application for any such permit, or

(B) the importation proposed to be made,

is first reviewed by the Marine Mammal Commission and the Committee of Scientific Advisors on Marine Mammals ... The Commission and Committee shall recommend any proposed taking or importation which is consistent with the purposes and policies of section 1361 of this title....

(2) Marine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued therefor under section 1374 of this title subject to regulations prescribed by the Secretary in accordance with section 1373 of this title.

.    .    .    .    .

(3)(A) The Secretary, on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission, is authorized and directed, from time to time, having due regard to the distribution, abundance, breeding habits, and times and lines of migratory movements of such marine mammals, to determine when, to what extent, if at all, and by what means, it is compatible with the chapter to waive the requirements of this section so as to allow taking or importing of any marine mammal, or any marine mammal product, and to adopt suitable regulations, issue permits, and make determinations in accordance with sections 1372, 1373, 1374, and 1381 of this title permitting and governing such taking and importing, in accordance with such determinations: *Provided, however,* That the Secretary, in making such determinations,

must be assured that the taking of such marine mammal is in accord with sound principles of resource protection and conservation as provided in the purposes and policies of this chapter: *Provided further, however,* That no marine mammal or no marine mammal product may be imported into the United States unless the Secretary certifies that the program for taking marine mammals in the country of origin is consistent with the provisions and policies of this chapter. Products of nations not so certified may not be imported into the United States for any purpose, including processing for exportation.

(B) Except for scientific research purposes or enhancing the survival or recovery of a species or stock as provided for in paragraph (1) of this subsection, during the moratorium no permit may be issued for the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any such mammal.

Title 16, U.S.C., § 1373(a) provides:

The Secretary, on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission, shall prescribe such regulations with respect to the taking and importing of animals from each species of marine mammal (including regulations on the taking and importing of individuals within population stocks) as he deems necessary and appropriate to insure that such taking will not be to the disadvantage of those species and population stocks and will be consistent with the purposes and policies set forth in section 1361 of this title.

Compliance with § 1373(a), it has been held, requires an OSP. *See Kokechik Fishermen's Assoc. v. Secretary of Commerce,* 839 F.2d 795, 801 (D.C.Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989).[8]

---

**8.** As defined in 50 C.F.R. § 216.3, OSP means "a population size which falls within a range from

the population level of a given species of stock which is the largest supportable within the eco-

There are two grounds upon which petitioners challenge the permits in both cases. First, petitioners assert that § 1371(a)(3)(A) prohibits the Secretary from issuing permits for the importation of the belugas and false killer whales without first certifying that the capturing country's program for "taking" marine mammals is consistent with that established by the MMPA. Second, petitioners contend that the Secretary was required by § 1373(a) to ascertain the OSP of both the false killer whales and the belugas prior to issuing the permits. Respondents take the position that neither § 1371(a)(3)(A) nor § 1373(a) apply at all to establish conditions precedent to the issuance of "public display" permits under § 1371(a)(1).

As is apparent, the express statutory language affords no answer to either question. The legislative history is unenlightening. None of the passages from case authority construing the MMPA represents a definitive holding on the precise issues presented.[9] And the canons of statutory construction are of no help.

What emerges somewhat more clearly from all of the above is Congress' general concern about protecting marine mammals from human depredations, so far as domestic U.S. law can reduce such perils, and to that end it enacted an absolute moratorium on their taking and importation, in contemplation of a comprehensive scheme to regulate activities potentially or actually detrimental to them to be formulated in due course by the Secretary. As a general proposition, it can be said that any significant taking or importation of marine mammals following passage of the Act was to occur, if at all, strictly in accordance with the Secretary's regulations.[10]

■ At the same time, it does appear that Congress also contemplated that there would be a limited number of instances in which an inconsequential quantity of animals could be taken or imported for beneficent purposes, such as for scientific research, stock preservation, or, as here, for public display. Consequently, in § 1371(a)(1) it gave the Secretary authority to grant a modest dispensation in such cases from the most onerous constraints of the MMPA—the absolute moratorium—without awaiting the outcome of more elaborate administrative proceedings the regulations might require for more destructive assaults upon the population of a species.

Even as to those minimal takings, however, § 1371(a)(1) does not allow indiscriminate or at-will seizures of marine mammals; permits are required, to be issued at the presumably well-intentioned discretion of the Secretary with specified conditions, and only upon the concurrence of other knowledgeable sources of official advice.

■ It is unnecessary, for the purposes of these cases, to determine what additional formalities might be required by § 1371(a)(3)(A) to attend the issuance of the permits allowed under that section. The permits in the Whales Cases derive from authority conferred upon the Secretary by § 1371(a)(1). Thus it cannot be said that the Secretary's actions were "not in accordance with law," and the inquiry turns to whether the Secretary's action in issuing the permits can be faulted as being arbitrary and capricious, measured against the underlying purpose of the MMPA, viz., "to provide marine mammals ... with necessary and extensive protection against man's activities."[11] *See Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

There are two reasons why the Secretary's grant of a permit in the API Case for the importation of the false killer whales reflects no abuse of discretion.

---

system to the population level that results in maximum net productivity."

**9.** *See, e.g., Committee for Humane Legislation v. Richardson,* 414 F.Supp. 297, 302–03 (D.D.C. 1976); *Committee for Humane Legislation v. Richardson,* 540 F.2d 1141, 1150–51 (D.C.Cir.

1976); *Kokechik Fishermen's Ass'n v. Sec'y of Commerce,* 839 F.2d 795 (D.C.Cir.1988).

**10.** Those regulations are now to be found at 50 C.F.R. §§ 216.1, *et seq.* (1991).

**11.** *Committee for Humane Legislation v. Richardson,* 414 F.Supp. 297, 306 (D.D.C.1976).

First, the record is now clear that the only whales to be imported under the permit will be *pseudorcas* already in captivity,[12] and their removal from the current inventory of Japanese oceanaria to the United States will thus have no direct effect on the wild population. Second, the administrative record discloses that information was before the Secretary at the time to the effect that false killer whales are neither "threatened" nor "endangered" under the ESA, nor have they been declared "depleted" under the MMPA.[13]

Similarly, the administrative record in the IWC Case reflects a decision that appears rationally supported. The Shedd import permit application indicates that the four beluga whales it seeks to import "would be taken from ... waters of the western Hudson Bay."[14] To assess the likely impact of such an action, the National Oceanic and Atmospheric Administration ("NOAA") prepared an Environmental Assessment on Shedd's application. In support of NOAA's conclusion that the "information presently available [with respect to beluga stock size] is sufficient on which to base a decision to issue" the permit,[15] NOAA cited two studies on belugas.[16] These studies were provided to the Department of Commerce on September 5, 1991,[17] and each of them independently estimates a "Western Hudson Bay Beluga" stock size of approximately 23,000 individual belugas. No evidence is shown to the contrary.

In sum, it appears that even after Shedd exercises its permits and imports the whales it wants, free-swimming *pseudorcas* and belugas will still be found in the ocean in abundance.

■ In a final effort to invalidate the permit in the API Case alone, petitioners assert that the Secretary did not comply with § 1372(b), the relevant text of which reads:

(b) Except pursuant to a permit for scientific research, or for enhancing the survival or recovery of a species or stock ... it is unlawful to import into the United States any marine mammal if such mammal was—

(1) pregnant at the time of taking;

(2) nursing at the time of taking, or less than eight months old, whichever occurs later;

. . . . .

(4) taken in a manner deemed inhumane by the Secretary.

An examination of that text together with the remainder of the statute discloses nothing to suggest the Congress intended to impose upon the Secretary herself an affirmative duty to assure that the particular animals the applicant proposes to import are not in a parenting way before issuing a license. Indeed, the permit issued by the Secretary states explicitly that "[t]he holder shall neither take nor import any mam-

**12.** *See* Application to Import, Admin. Rec. No. 1, at IV.C. The Court accepts as true, in the absence of evidence to the contrary, the representation of the federal defendants that the boilerplate phrase appearing in the permit itself, i.e., that which states that the "animals authorized *shall* be taken" (emphasis supplied), was inadvertent, and has no meaning in the context of this permit. *See* Federal Defendants' Response to Court's Order of July 13, 1992.

**13.** Memo. from Nancy Foster to James W. Brennan, National Oceanic and Atmospheric Administration, April 28, 1989, p. 3, appearing at API Case Admin.Rec. No. 39.

Moreover, the record before the Court now indicates that current estimates of the size of the false killer whale population in the North Pacific, the East China Sea, and the Sea of Japan are in the vicinity of 48,000. *See* Report of International Whaling Commission, Subcommittee on Small Cetaceans, Annex G (June 28, 1992) at 12,

appearing as Exhibit A to Federal Defendants' Response to Court's Order of July 13, 1992.

**14.** IWC Case Admin.Rec. P.2.

**15.** IWC Case Admin.Rec. P.57, at B.2.C.

**16.** Richard, *et al.,* The Distribution and Abundance of Beluga, Delphinapterus Leucas, in Eastern Canadian Subarctic Waters: A Review and Update, appearing in Advances in Research on the Beluga Whale, Delphinapterus Leucas (Smith, *et al.,* eds.), Can.Bull.Fish.Aquat.Sci. 224 (1990); and Cosens, *et al.,* Report of the Arctic Fisheries Scientific Advisory Committee for 1988/89, Can.Manuscr.Rep.Fish.Aquat.Sci. 2063 (1990).

**17.** Letter from Robert W. Moshenko to Anna Terbush, with appendices. IWC Case Admin.Rec. P.19.

mal which is pregnant, a lactating female, or is an unweaned young mammal." [18] The permit also declares that "[a]ll marine mammals must be taken in a humane manner.... Any inhumane taking shall subject the Holder to the penalties of the [MMPA], including revocation of the permit." [19]

For the foregoing reasons, therefore, it is, this 31st day of July, 1992,

ORDERED, that the petitioners' motion for summary judgment in the case of *Animal Protection Institute, et al. v. Mosbacher*, C.A. 89–1696, is denied; and it is

FURTHER ORDERED, that the motions of the federal respondents and each of the intervenor-respondents for summary judgment in the case of *Animal Protection Institute, et al. v. Mosbacher*, C.A. 89–1696, are granted; and it is

FURTHER ORDERED, that the petitioners' motion for summary judgment in the case of *International Wildlife Coalition, et al. v. Franklin*, C.A. 92–0223, is denied; and it is

FURTHER ORDERED, that the motions of the federal respondents and the intervenor-respondent for summary judgment in the case of *International Wildlife Coalition, et al. v. Franklin*, C.A. 92–0223, are granted; and it is

FURTHER ORDERED, that Civil Action Nos. 89–1696 and 92–0223 are dismissed with prejudice.

---

**18.** API Case Admin.Rec. 41 at C.2.g.

**19.** API Case Admin.Rec. 41, at C.2.f.