US ECOLOGY, INC., a California Corporation, Appellant,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Appellees.

No. 99–5192.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 5, 2000.

Decided Nov. 14, 2000.

Karl S. Lytz argued the cause and filed the briefs for appellant. Laurence H. Levine and Peter L. Winik entered appearances.

Mark R. Haag, Attorney, United States Department of Justice, argued the cause for appellees. With him on the brief were Lois J. Schiffer, Assistant Attorney General, and David C. Shilton, Attorney.

Eric R. Glitzenstein, Howard Crystal, and Jonathan R. Lovvorn were on the brief for intervenor/appellees.

Fran M. Layton, Mark A. Fenster, Alan K. Marks, and Susan L. Nash were on the brief for amicus curiae County of San Bernardino.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

This case involves a dispute over the availability of the so-called "Ward Valley Site" for potential use as a low-level radioactive waste ("LLRW") facility. Ward Valley is a 1.7 square mile plot of the Mojave Desert located just off I–40, 25 miles west of the Colorado River separating Arizona from California. Appellee the Federal Government owns the site and appellant US Ecology wants to develop, build, and operate a LLRW facility on the site as a licensee for the State of California. The Federal Government, however, has declined to transfer the land to the

State of California, thus dashing US Ecology's hopes to proceed as developer and operator of a LLRW facility on the Ward Valley Site.

In 1987, pursuant to the Southwestern Low–Level Radioactive Waste Compact, California's Department of Health Services ("CDHS") identified the Ward Valley Site as the preferred location for the Compact's first regional LLRW disposal facility. In 1988, the State of California contracted with US Ecology, Inc., a private company in the business of constructing and managing LLRW facilities around the country, to develop the site. On January 19, 1993, the outgoing Secretary of the Interior, Manuel Lujan Jr., issued a Record of Decision announcing his approval of the direct sale of the Ward Valley Site to the State of California for potential use as a LLRW facility. The sale and transfer of land never happened, however. Citing concerns that his predecessor had not only subverted the administrative process, but also prematurely issued the Record of Decision in direct violation of a federal judge's temporary restraining order, incoming Secretary of the Interior Bruce Babbitt rescinded Secretary Lujan's Record of Decision on February 18, 1993.

In January 1997, CDHS brought suit in the District Court challenging Secretary Babbitt's 1993 rescission. US Ecology filed suit one month later. Because both complaints raised substantially similar claims, the District Court consolidated the cases. In March 1999, the District Court granted defendants' motion for summary judgment on all counts. *See California Dep't of Health Servs. v. Babbitt*, 46 F.Supp.2d 13 (D.D.C.1999). CDHS elected not to appeal the judgment of the District Court. As a result, only US Ecology is before this court.

The current posture of the case bars this court from reaching the merits of the claims that were before the District Court. This is so because appellant US Ecology, now on its own, does not have standing to contest the Federal Government's refusal to transfer the Ward Valley land to the State of California. Even were we to disagree with the District Court and find that Secretary Babbitt improperly rescinded the Record of Decision, appellant's alleged injury would not be redressable unless and until California accepted transfer of the disputed land and elected to proceed with the Ward Valley project. On the record at hand, appellant has no grounds upon which to claim that California will follow these courses; indeed, appellant could not make any concrete assertions on these scores even were the Federal Government to now propose to transfer the Ward Valley land to the state. Absent a showing of redressability, US Ecology's appeal must be dismissed for want of standing. Accordingly, we vacate the District Court's judgment as to appellant and dismiss this case for want of jurisdiction.

## I.  BACKGROUND

### A.  Factual Background

In 1987, California entered into the Southwestern Low–Level Radioactive Waste Compact with Arizona, North Dakota, and South Dakota pursuant to the Low–Level Radioactive Waste Policy Act Amendments of 1985, 42 U.S.C. §§ 2021b–2021j (1994). The Act makes states accountable for their own LLRW production and disposal, and authorizes them to form interstate compacts for the establishment of regional LLRW disposal facilities. 42 U.S.C. §§ 2021c, 2021d. Under the Southwestern Compact, California is responsible for developing and operating the group's first such regional facility. CAL. HEALTH & SAFETY CODE § 115255, art. 4(C)(1) (West 1996). Prior to entering into the Compact, California had chosen appellant U.S. Ecology as its license-designee to evaluate potential sites, to aid in the land application process, and, after acquisition of the land, to develop, build, and operate its LLRW facility. US Ecology worked in conjunction with and under the oversight of CDHS, the agency charged with managing

disposal of California's low-level radioactive waste.

Beginning in 1987, CDHS, with the help of US Ecology, filed a series of school land indemnity applications pursuant to 43 U.S.C. §§ 851–852 (1986), seeking to acquire the Ward Valley Site from the Bureau of Land Management ("BLM"). In July of 1992, California shifted its application strategy and requested that BLM sell the Ward Valley Site directly to the state pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1784 (1986), rather than under the school indemnity provisions. Under FLPMA, BLM may at its discretion grant an application for direct sale if it finds the transfer to be in the national interest and "disposal of such tract will serve important public objectives." 43 U.S.C. §§ 1701(a), 1713(a)(3). Upon such a finding, BLM must publish a Notice of Realty Action, thereby providing interested parties with notice and 45 days in which to comment on the proposed transfer. See 43 C.F.R. §§ 2711.1–2(a), 2711.3–3 (1998). Only then may BLM proceed with the sale.

Before an agency takes any action that threatens the environment, it must also comply with the National Environmental Policy Act ("NEPA"), which requires the agency to prepare and issue an Environmental Impact Statement assessing any potential environmental impacts of its proposed action. National Environmental Policy Act of 1969, 42 U.S.C. § 4332(C) (1994). Under NEPA regulations, the agency must file with EPA the Final Environmental Impact Statement along with public comments received regarding the proposed statement, which are then published in the Federal Register. See 40 C.F.R. §§ 1506.9–.10 (1998). An agency must wait at least 30 days following publication before taking any action based on the Final Environmental Impact Statement, after which time NEPA regulations require the agency to prepare a Record of Decision justifying its ultimate decision. See 40 C.F.R. §§ 1505.2, 1506.10(b).

US Ecology, in conjunction with BLM and CDHS, submitted the required impact statement in September of 1989, and BLM published the Final Environmental Impact Statement in May of 1991. Before BLM issued its Record of Decision, however, California shifted its school indemnity application to one for direct sale under FLPMA. In response, BLM published a notice of intent to prepare a Supplemental Environmental Impact Statement on September 11, 1992, to assess any further environmental impacts associated with acquisition under the direct sale provisions. See Notice of Intent to Prepare Supplemental Environmental Impact Statement, 57 Fed.Reg. 41,771 (1992). After a period for comment, BLM filed its Final Supplemental Environmental Impact Statement on December 28, 1992, beginning the 30–day waiting period set to end on January 27, 1993. At roughly the same time as it issued its notice of intent to prepare a Supplemental Environmental Impact Statement, the Department of the Interior had published a Notice of Realty Action notifying the public that BLM was considering transfer of the Ward Valley Site to California pursuant to FLPMA's direct sale provisions. In response, interested parties lodged a multitude of protests and three filed mining claims related to the site.

On January 7, 1993—only 10 days after filing its Final Supplemental Environmental Impact Statement with EPA—Secretary Lujan announced that there had been no need to supplement the original Final Environmental Impact Statement, because, under NEPA, the method of transfer would not affect the potential environmental harm. He converted the Supplemental Environmental Impact Statement into a less formal Environmental Assessment, which does not require a 30–day post-publication waiting period, and issued a Finding of No Significant Impact. The Secretary also issued a memorandum declaring that, upon final disposition of the three mining claims

pending before the Interior Board of Land Appeals, he intended to dismiss the Notice of Realty Action protests, publish his Record of Decision approving direct sale, and issue a land patent transferring title of the Ward Valley Site to the State of California. The next day, appellant US Ecology wired $500,000 to a BLM-designated account as payment for the land.

Not to be outdone, project opponents filed suit in the United States District Court for the Northern District of California alleging that the Department of the Interior had violated the Endangered Species Act by failing to designate critical habitat for the desert tortoise. The District Court immediately issued a temporary restraining order mandating that the Department of the Interior was "[t]hereby temporarily restrained from transferring any BLM land in the Ward Valley." *Desert Tortoise v. Lujan,* No. 93–0114 (N.D. Cal. Jan. 8, 1993) (order granting temporary restraining order). Despite the District Court's order, Secretary Lujan executed the Record of Decision at issue on January 19, 1993—his last day in office. He did not, however, issue a patent in the land. Upon discovering that Secretary Lujan had executed the Record of Decision, the District Court expanded its order to prevent the Department from "executing any document or taking any other action" to effectuate transfer of the Ward Valley Site. *Desert Tortoise,* No.93–0114 (N.D. Cal. Jan. 19, 1993) (order extending temporary restraining order). Less than one month later, and in the midst of three pending lawsuits, incoming Secretary Babbitt rescinded the Record of Decision. BLM later returned the $500,000 to US Ecology.

B. Proceedings in the District Court

In early 1997, both CDHS and US Ecology filed separate complaints against Secretary Babbitt, Deputy Secretary of the Interior John Garamendi, the Department of the Interior itself, and the Bureau of Land Management. Because each party alleged substantially similar claims, the cases were consolidated on October 27, 1997. On March 31, 1999, the District Court granted the defendants' motion for summary judgment on the merits regarding all of the consolidated claims. *See California Dep't of Health Servs.,* 46 F.Supp.2d at 13. By the time of the District Court's decision, Pete Wilson, whose administration had spear-headed the effort to obtain the Ward Valley Site, was no longer the Governor of California. In his stead was Gray Davis, the newly elected Governor, who as State–Controller had been a named plaintiff in a pre-rescission suit brought by opponents to undermine sale of the Ward Valley Site. CDHS officials, acting on behalf of the State of California, chose not to appeal the District Court's decision, and this court has dismissed US Ecology's attempt to itself appeal the judgment against CDHS. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior,* No. 99–5192, 1999 WL 1006813, at *1 (D.C.Cir. Oct.8, 1999) (per curiam) (order of motions panel dismissing CDHS appeal). Thus, only US Ecology's appeal of its own suit remains.

A number of noteworthy events have arisen since the District Court issued its decision. On November 2, 1999, DOI notified CDHS that it was terminating further consideration of, and denying without prejudice, CDHS's request for direct sale of the Ward Valley Site. *See* Processing Terminated: Request for Sale Denied, CACA 30582 (Dep't Interior Nov. 2, 1999) (unpublished decision of the Department of the Interior), *reprinted in* Motion of Appellant US Ecology, Inc. Pursuant to Federal Rule of Appellate Procedure 10(E)(3) and Request for Judicial Notice, Exhibit B (Apr. 27, 2000). DOI cited the fact that CDHS Director Dr. Diana Bontá had not responded to a September 16, 1999 letter in which BLM Deputy Director Tom Fry proposed termination of CDHS's still-pending sale request. The letter had given the following reasons for termination:

the State's decision to forgo an appeal from the adverse decision in District Court; the formation of the Atkinson advisory group seeking workable alternatives [to the Ward Valley facility]; the lack of funds in the State budget for Ward Valley activities; the apparent lack of authority of DHS to acquire land; and the substantial steps, including tritium tests and preparation of an SEIS, that would be required to proceed with the requested sale.

*Id.* at 3. Also, in a related contract action against the United States, the Court of Federal Claims ruled that Secretary Lujan's Record of Decision had not created a contract between CDHS and the United States, and, *a fortiori,* had not created any rights in US Ecology as third-party beneficiary. *See U.S. Ecology, Inc. v. United States,* No. 97–65L (Fed. Cl. Mar. 27, 2000) (unpublished opinion). Finally, on May 2, 2000, appellant US Ecology filed suit against the State of California in California state court alleging breach of contract for failing to use its best efforts to obtain and develop the Ward Valley Site. *See* US Ecology's Complaint, *US Ecology, Inc. v. State of California,* No. 747562 (Cal.Super. Ct. filed May 2, 2000). In addition to damages, US Ecology seeks from the state court a writ of mandate ordering Governor Davis and CDHS to take all steps necessary to comply with California's contract with US Ecology, including requesting rescission of the November 2, 1999 decision of the Department of the Interior. *See id.* ¶¶ 73–81.

## II. Analysis

■ Because plaintiff CDHS unquestionably had standing to challenge Secretary Babbitt's 1993 rescission, the District Court had no occasion to consider appellant US Ecology's standing to do the same. *See Environmental Action v. FERC,* 996 F.2d 401, 406 (D.C.Cir.1993) ("[O]nce one petitioner has demonstrated standing we may permit the participation of others."). Article III's jurisdictional mandate does not disappear on appeal, however, and the

"ability to ride 'piggyback' on the State's undoubted standing exists only if the State is in fact an appellant before the Court." *Diamond v. Charles,* 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). Thus, as the sole party now before us on appeal, US Ecology must independently demonstrate Article III standing. This it has not done.

■ To establish the "irreducible constitutional minimum" for Article III standing, a party must show that it has suffered an injury in fact, that there exists a causal link between that injury and the conduct complained of, and that a favorable decision on the merits will likely redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "This triad ... constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Because a deficiency on any one of the three prongs suffices to defeat standing, we address only US Ecology's most obvious failing—its inability to demonstrate that it is " 'likely,' as opposed to merely 'speculative,' that [its] injury will be 'redressed by a favorable decision.' " *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials. This is so, because the question of "[w]hether [appellant's] claims of economic injury would be redressed by a favorable decision [in such a] case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). When re-

dress depends on the cooperation of a third party, "it becomes the burden of the [appellant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. 2130.

Appellant has not met this burden, admitting, as it must, that, even were the Department of the Interior to issue a patent as US Ecology requests, only the State of California is capable of accepting title and taking ownership of the land. Secretary Babbitt's 1993 rescission delayed *California's* application for direct sale under FLPMA; the Department of the Interior's decision of November 2, 1999, terminated *California's* application for the Ward Valley Site. Whether and how to comply with the Low-Level Radioactive Waste Amendments and Southwestern Compact is *California's* responsibility alone. Certainly, we do not begrudge appellant its disappointment at having invested—and perhaps lost—time and money in the Ward Valley project. But, such injury, without more, is not enough.

Appellant seeks refuge in a few lines of dicta found in this court's recent opinion in *University Medical Center of Southern Nevada v. Shalala,* 173 F.3d 438 (D.C.Cir. 1999). In that case, appellant University Medical Center ("UMC") challenged the Department of Health and Human Services' failure to retroactively place UMC on a list of eligible hospitals entitled to pharmaceutical discounts from participating drug manufacturers. HHS had, by the time of suit, placed UMC on the list; however, UMC argued that, were HHS to backdate its listing of UMC to the point in time when UMC actually had been eligible, UMC could perhaps obtain two years' worth of retroactive drug discounts. Because the contract between HHS and the participating drug manufacturers did not require the drug manufacturers to provide such retroactive discounts, we held that

UMC's injury was only speculatively redressable. In so holding, we stated:

> If it could be said that UMC was *legally entitled* to get the discounts as a result of being placed on the list effective December 1, 1992, then we might have a different situation. That would force us to ask how likely it was that appellant would succeed in the second suit.... But we do not have to wrestle with this problem because UMC does not even claim that it has a contingent legal right against the drug manufacturers.

*Id.* at 442 (emphasis in original). US Ecology claims that the instant case presents the "different situation" contemplated in the foregoing dicta. We are not persuaded.

Even assuming, *arguendo,* that the hypothetical raised in *University Medical Center* poses a circumstance under which the redressability problem might be avoided, US Ecology can find no solace in the dicta. The circumstances of this case are quite different from the *University Medical Center* hypothetical, because, on the record before this court, US Ecology cannot demonstrate any legally enforceable right that California must (1) accept the Ward Valley Site if offered, and (2) proceed with plans to build a LLRW facility on the land. Indeed, the record before this court does not even support a finding that US Ecology would be entitled to develop the facility were California ultimately to pursue the Ward Valley Site.

The mere fact that appellant has brought suit in California state court on many of these issues says nothing about the underlying merits of those claims nor the remedy to which US Ecology would be entitled should it prevail. Here, as in *University Medical Center,* "[e]ven if appellant had a declaratory judgment that the government unlawfully" rescinded its Record of Decision, US Ecology has not shown "how, or under what legal theory, it would be entitled to recover against" the State of California. *Id.* In short, US

Ecology has failed to demonstrate redress-ability to support standing.

### III. CONCLUSION

Because appellant lacks standing to pursue this appeal, we vacate the District Court's judgment as to US Ecology and dismiss this case for want of jurisdiction.