The FUND FOR ANIMALS,
et al., Plaintiffs,

v.

Gale NORTON, et al., Defendants.

No. CIV.A.01–813 (GK).

United States District Court,
District of Columbia.

July 31, 2003.

Opinion Denying Reconsideration
Oct. 30, 2003.

Keith William Razzardi, Wayne Douglas Hettenbach, U.S. Department of Justice, Wildlife & Marine Resources Washington, DC, for defendants.

Katherine Anne Meyer, Jonathan Russell Lovvorn, Howard Mesnikoff Crystal, Meyer & Glitzenstein, Washington, DC, for plaintiffs.

Anna M. Seidman, Vienna, VA, for movant.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs, four conservation organizations committed to preserving animal species in their natural habitats and three individuals involved in argali sheep conservation efforts,[1] bring this action under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Plaintiffs challenge the granting of permits by the Department of Interior and its Fish and Wildlife Service ("FWS" or "Service") to sport hunters for the importation from Kyrgyzstan, Mongolia, and Tajikistan of argali sheep "trophies."[2] Plaintiffs also challenge the Service's 2002 Withdrawal of its Proposed Rule to list the argali sheep in those countries as endangered, rather than threatened, under the ESA.

Defendants are Gale Norton, Secretary of the Interior ("Secretary"), who has ultimate responsibility for implementing the ESA, and Steven Williams, Director of FWS, the agency that has been delegated the day-to-day responsibility for implementing the ESA. On September 4, 2001, the Court granted the Motion of Safari Club International and U.S. Sportsmen's Alliance Foundation (collectively "Safari Club") to intervene on behalf of Defendants. That same day, the Court also permitted the Foundation for North American Wild Sheep, Grand Slam Club/OVIS, Conservation Force, Dr. Paul Valdez, Dr. Bart O'Gara, Dr. James Teer, Douglas C. Stromberg, Ron Bartels, Ben Seale, Clark S. Ullom, and Lee. G. Lipscomb (collectively "FNAWS"), to also intervene on behalf of Defendants.[3]

The matter is now before the Court on the Motions for Summary Judgment filed by Plaintiffs, Defendants, Intervenors Safari Club, and Intervenors FNAWS. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, for the reasons discussed below,

---

1. Plaintiffs are The Fund for Animals, the Animal Legal Defense Fund, Inc., the Earth Island Institute, the Argali Wildlife Resource Center, Sukh Amgalanbaatar, Zundui Namshir, and Dr. Ron Nowak.

2. "Trophies" refer to the argali sheep head or other parts of the body.

3. Pursuant to the D.C. Circuit's ruling on March 18, 2003, the Court granted the motion of the Natural Resources Department of the Ministry of Nature and Environment of Mongolia ("NRD") to intervene on March 18, 2003, and afforded it until April 15, 2003, to file any motion in support of summary judgment. The NRD did not file any motions or seek an extension of time in which to do so.

Plaintiffs' Motion for Summary Judgment is **denied**, Defendants' Motion for Summary Judgment is **denied as moot**, Intervenors Safari Club's Motion for Summary Judgment is **granted**, and Intervenors FNAWS' Motion for Summary Judgment is **granted**.

# I. STATUTORY FRAMEWORK

## A. Overview

The ESA is the " 'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.' " *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). When Congress enacted the statute in 1973, it intended to bring about the "better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5). Having found that a number of species of fish, wildlife, and plants in the United States had become extinct "as a consequence of economic growth and development untempered by adequate concern and conservation," Congress intended the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species." *Id.* § 1531(a)(1), (b).

In particular, the legislative history of the statute reflects a "consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status." *Southwest Ctr. for Biological Diversity v. Babbitt,* 926 F.Supp. 920, 924 (D.Ariz.1996); *see* H.R.Rep. No. 412, 93d Cong., 1st Sess. 10 (1973), *reprinted in* 1978 U.S.C.C.A.N. 2989, 2998.

The Act imposes certain responsibilities on the Secretary of the Interior who has in turn delegated day-to-day authority for implementation of the ESA to FWS, an entity within the Department of the Interior. 16 U.S.C. § 1531(b); 50 C.F.R. § 402.01(b). The ESA's protection of a species and its habitat is triggered only when FWS "lists" a species in danger of becoming extinct as either "endangered" or "threatened." 16 U.S.C. § 1533. The Act defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

A species is "endangered" when it is in "danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future." *Id.* § 1532(20).

## B. Importation of Endangered and Threatened Species

The ESA treats the importation of endangered and threatened species differently. The Act expressly prohibits the importation of "endangered" species, *Id.* § 1538(a), but authorizes a limited exception. A person seeking to import an endangered species may do so only "(A) for scientific purposes or to enhance the propagation or survival of the affected species.... [or] (B) incidental to, and not [for] the purpose of, the carrying out of an otherwise lawful activity." *Id.* § 1539(a)(1)(A),(B). An applicant must apply for a permit, and satisfy specific criteria. *Id.* § 1539(a)(2)(A),(B). Further, the Secretary is required to publish notice in the Federal Register of each application for an exemption or permit, and to afford interested parties an opportunity to comment on the application. *Id.* § 1539(c).

By contrast, the ESA contains no express prohibition on the importation of "threatened" species. It does, however, contain a provision that requires the Secretary to ensure that all regulations issued concerning "threatened" species are issued for "the conservation of such species;"[4] the ESA also allows the Secretary to afford threatened species the same protections afforded to endangered species regarding, *inter alia*, imports. *Id.* § 1533(d). Specifically, the ESA provides that:

d) Protective regulations

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as [s]he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title [*i.e.,* "Prohibited Acts" including imports], in the case of fish or wildlife . . . .

*Id.* § 1533(d).

Consistent with this authority, the Secretary has issued regulations providing threatened species some of the same protections afforded endangered species. 50 C.F.R. § 17.31(a). For example, ESA regulations prohibit the importation of both threatened and endangered species, unless certain permit criteria apply. *Id.* § 17.21(b); *Id.* § 17.31(a).[5]

The particular permit criteria for endangered and threatened species, however, are different from one another and are set forth in separate regulations. The permit criteria for endangered species are set forth in 50 C.F.R. § 17.22. The permit criteria for threatened species are set forth at 50 C.F.R. § 17.32.

### 1. Section 17.32

Section 17.32, the regulation governing threatened species, provides that, while the importation of threatened wildlife is generally prohibited, a person may apply for a permit to import such wildlife for certain limited purposes as long as the listed criteria are met.[6] *Id.* § 17.32. The regulations also provide that if the Secretary has issued a "Special Rule" applicable to a particular threatened species, the issuance of permits for that species is gov-

---

4. "Conservation" is defined to mean

the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Chapter are no longer necessary. Such methods and procedures include...all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping...and in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3).

5. Specifically, 50 C.F.R. § 17.21(b) provides that "[i]t is unlawful to import or to export

any endangered wildlife." 50 C.F.R. § 17.21(b). Section 17.31(a) makes this prohibition applicable to threatened species: "all of the provisions in 17.21 shall apply to threatened wildlife." *Id.* § 17.31(a).

6. Section § 17.32(a) provides that permits issued under this section "must be for one of the following purposes: Scientific purposes, or the enhancement of propagation or survival, or economic hardship, or zoological exhibition, or educational purposes, or incidental taking, or special purposes consistent with the purposes of the Act." *Id.* § 17.32(a).

Section § 17.32 also sets forth certain criteria that must be satisfied by the applicant before issuance of a permit. *Id.* § 17.32(a)(2)(i-vi).

erned by the Special Rule.[7] *Id.* §§ 17.31(c), 17.32.

### 2. Special Rule Relating to the Argali Sheep

The Secretary has issued a Special Rule governing issuance of import permits for the argali, which is set forth at 50 C.F.R. § 17.40(j). The Special Rule provides that in order to obtain an import permit for the argali, an applicant has two options. She can either satisfy the permit requirements applicable to threatened species provided in § 17.32. *Id.* § 17.40(j)(1).[8] Or, in the alternative, if the countries from which argali trophies are imported provide certain "certification" and documentation regarding the argali populations in their country, "the Director may, consistent with the Act, authorize ... the importation of personal sport-hunted argali trophies, taken legally in Kyrgyzstan, Mongolia, and

7. Section 17.31(c) provides that: "Whenever a special rule in §§ 17.40 to 17.48 applies to a threatened species, none of the provisions of paragraphs (a) and (b) of this section will apply. The special rule will contain all the applicable prohibitions and exceptions." *Id.* § 17.31(c).

Section 17.32 provides that: "Such permit shall be governed by the provisions of this section unless a special rule applicable to the wildlife, appearing in § 17.40 to 17.48, of this part provides otherwise." *Id.* § 17.32.

8. Section 17.40(j)(1) of the Special Rule provides: "Except as noted in paragraph (j)(2)... all prohibitions of § 17.31 of this part and exemptions of § 17.32 of this part shall apply to this species in Kyrgyzstan, Mongolia, and Tajikistan. (Note—In all other parts of its range the argali is classified as endangered and covered by § 17.21)." *Id.* § 17.40(j)(1).

9. Section 17.40(j)(2) of the Special Rule provides:

Upon receiving from the governments of Kyrgyzstan, Mongolia, and Tajikistan properly documented and verifiable certification

Tajikistan ... without a Threatened Species permit pursuant to 17.32." *Id.* § 17.40(j)(2).[9]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Argali Sheep

The argali sheep is an Asian relative of the North American bighorn sheep, and is the largest species of wild sheep in the world. It weighs between 210–310 pounds, and has spiral horns that can grow to 75 inches in length and 20 inches in circumference.

The historic range of the argali includes Kazakhstan, Kyrgyzstan, Tajikistan, Uzbekistan, southern Siberia, Mongolia, north-central and western China (including Tibet), Nepal, and the Himalayan portions of Afghanistan, Pakistan, and India. 57 Fed.Reg. 28014 (June 23, 1992).

that (a) argali populations in those countries are sufficiently large to sustain sport hunting, (b) regulating authorities have the capacity to obtain sound data on these populations, (c) regulating authorities recognize these populations as a valuable resource and have the legal and practical capacity to manage them as such, (d) the habitat of these populations is secure, (e) regulating authorities can ensure that the involved trophies have in fact been legally taken from the specified populations, and (f) funds derived from the involved sport hunting are applied primarily to argali conservation, the Director may, consistent with the purposes of the Act, authorize by publication of a notice in the Federal Register the importation of personal sport-hunted argali trophies, taken legally in Kyrgyzstan, Mongolia, and Tajikistan after the date of such notice, without a Threatened Species permit pursuant to § 17.32 of this part, provided that the applicable provisions of 50 CFR part 23 have been met. *Id.* § 17.40(j)(2).

### B. The Argali's Listing and Permit History

In 1992, the Service published its Final Rule listing the argali as an endangered species throughout its historic range, except for Kyrgyzstan, Mongolia, and Tajikistan, where it is listed as threatened. *Id.* One year later, the Service published a Proposed Rule to list the argali as endangered in those three countries as well. 58 Fed.Reg. 25595–25600 (April 27, 1993). In 2002, the Service withdrew the Proposed Rule to list the argali as endangered in Kyrgyzstan, Mongolia, and Tajikistan ("Withdrawal Notice" or "Withdrawal"). 67 Fed.Reg. 35942–35957 (May 22, 2002). Plaintiffs challenge the 2002 Withdrawal Notice as arbitrary, capricious, and contrary to law, in violation of the ESA and APA.

Pursuant to 50 C.F.R. § 17.32, in 2000, 2001, and 2002, the Service issued permits authorizing the importation of sport-hunted argali trophies from Kyrgyzstan, Mongolia, and Tajikistan. In addition to challenging the 2002 Withdrawal Notice, Plaintiffs also allege that the Service issued these import permits in violation of the ESA and the Service's own regulatory scheme for argali.

### III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Under the APA, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this determination, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld," *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted), even though the Court itself might have made different choices.

■ Under arbitrary and capricious review, the Court does not undertake its own fact-finding. Instead, the Court must review the administrative record assembled by the agency to determine whether its decision was supported by a rational basis. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

### IV. PLAINTIFFS DO NOT HAVE STANDING

As noted above, Plaintiffs challenge FWS' issuance of import permits for argali trophies from Kyrgyzstan, Mongolia, and Tajikistan, as well as FWS' 2002 Withdrawal of the Proposed Rule to list the argali as endangered in Kyrgyzstan, Mongolia, and Tajikistan.

■ As a threshold matter, Intervenors contend that Plaintiffs do not have standing to raise these claims. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court held that, to establish the "irreducible constitutional minimum" for Article III standing, a party must show that it has suffered an injury in fact, that there exists a causal connection between that injury and the conduct complained of, and that a favorable decision on the merits

will likely redress the injury. *Id.* Here, Intervenors contend that Plaintiffs' purported injuries will not be redressed by success in this litigation and that the organizational Plaintiffs do not have informational standing.[10]

### A. Plaintiffs' Injuries Will Not Be Redressed By Success In This Litigation

 Plaintiffs' purported injuries result from the sport hunting of argali in Kyrgyzstan, Mongolia, and Tajikistan. Plaintiffs have not established, however, that these injuries will be redressed by success in this litigation.

FWS' import permits and related threatened listing of argali do not authorize the killing of argali that Plaintiffs challenge. Instead, it is the governments of Kyrgyzstan, Mongolia, and Tajikistan that authorize the hunting and killing of argali; the Service's permit program merely authorizes the import into the United States of those trophies. *See* 50 C.F.R. § 17.32. Thus, even if the Service allowed no import permits, the three governments would remain as free as they now are to permit the sport hunting of argali in their own countries. Indeed, even if the argali in these countries were listed as endangered under the ESA, that listing would not prohibit the three governments from authorizing the hunting or killing of argali because the ESA specifically limits its prohibition against takings to the United States, its territorial seas, or the high seas; the ESA's prohibition does not extend to foreign countries. *See* 16 U.S.C. § 1538(a)(1).

In *U.S. Ecology, Inc. v. U.S. Dep't of the Interior*, 231 F.3d 20 (D.C.Cir.2000), the D.C. Circuit evaluated similar circumstances in which the plaintiff's redress was

dependent on policy decisions yet to be made by government officials who were not parties to the suit. Specifically, the Court of Appeals denied standing to the proposed developer of a radioactive waste facility who challenged the Secretary of Interior's decision not to approve the sale of federal land to the state of California.

The D.C. Circuit concluded that the developer could not sufficiently establish that his success in the federal litigation would redress his injuries because his redress was contingent on the independent actions and decisions of the state of California—which had not even been taken—namely, the decision whether or not to accept title and take ownership of the land in question. In doing so, the Court emphasized that

> Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials. This is so, because the question of "[w]hether [appellant's] claims of economic injury would be redressed by a favorable decision [in such a] case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict. When redress depends on the cooperation of a third party, it becomes the burden of the [appellant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."

*Id.* at 24 (quotations omitted).

The circumstances in this case are directly analogous to those in *U.S. Ecology*. In both cases, Plaintiffs' redress depends on the unfettered choices to be made by

---

10. Because the Court concludes that Plaintiffs have not satisfied the redressability component of *Lujan,* it need not address Interve-

nors' additional argument that Plaintiffs have not suffered any injury in fact.

independent government actors. As in *U.S. Ecology,* Plaintiffs here have also failed to meet their burden of demonstrating that those choices, which can only be made by the governments of Kyrgyzstan, Mongolia, and Tajikistan, have been or will be made in such a manner as to reduce the sport hunting and killing of argali.

In fact, there is evidence that, when the United States previously banned imports from Tajikistan, the government did not limit sport hunting, and the killing of argali continued by virtue of hunting by non-U.S. citizens and increased poaching. *See* Safari Club Exs. A–C, Safari Club Reply Exs. A & B, AR 874–904. The evidence further reveals that, because U.S. hunters generally pay the highest prices for hunting permits issued by the Tajikistan government, the absence of legal U.S. hunting substantially decreased the permit revenues received by the Tajikistan government. Because permit revenues were used in part for conservation and to "convince the local population not to poach," the decreased revenues actually resulted in increasing the amount of poaching in the region. *Id.*

While Intervenors have offered evidence that the hunting and killing of argali will not decrease as a result of a U.S. ban on imports, Plaintiffs have only offered speculation that, because the majority of hunting permits issued by Kyrgyzstan, Mongolia, and Tajikistan have been issued to U.S. hunters, the Service's prohibition on imports will likely decrease the hunting of argali. Although U.S. hunters currently comprise the majority of argali hunters in these countries, the evidence addressed above reveals that, if U.S. hunters were prohibited from hunting argali, hunters from other countries and increased poaching would take their place. While Plaintiffs "need not negate every conceivable impediment to effective relief no matter

how speculative," *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811 (D.C.Cir.1983), Plaintiffs have failed here, as in *U.S. Ecology,* to demonstrate that it is " 'likely, as opposed to merely 'speculative,' that [their] injury will be redressed by a favorable decision.' " *U.S. Ecology,* 231 F.3d at 24 (quoting *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130).

In sum, Plaintiffs' redress depends on the intervening actions of the governments of Kyrgyzstan, Mongolia, and Tajikistan—namely their decision whether to limit the hunting and killing of argali in their respective countries. Because a prohibition on the importation of argali into the United States and a listing of the argali in those countries as endangered under the ESA would not prohibit those governments from issuing hunting permits, and because prior U.S. import restrictions did not decrease the hunting and poaching of argali, Plaintiffs have failed to demonstrate that they will likely obtain redress from a favorable decision on the merits.

### B. The Organizational Plaintiffs Do Not Have Informational Standing

Plaintiffs further contend that the organizational Plaintiffs have standing to challenge the Service's import permits and Withdrawal of the Proposed Rule "by virtue of the injury they suffer from the denial of information to which they are statutorily entitled." Pl. Opp'n at 42. Specifically, Plaintiffs contend that Section 10 of the ESA entitles them to information about import permit applications and to notice and comment. *See* 16 U.S.C. § 1539.

It is well settled that plaintiffs may suffer injury as a result of a denial of information to which they are statutorily entitled. *See FEC v. Akins,* 524 U.S. 11, 18, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). Here, however, Plaintiffs are not statutori-

ly entitled to the information they seek or to a notice and comment period. Section 10 of the ESA, on which Plaintiffs rely, specifically applies only to endangered species. As noted above, the argali in Kyrgyzstan, Mongolia, and Tajikistan are listed as threatened, not endangered. Therefore, it is clear from the plain language of the ESA that the notice and comment provisions contained in Section 10 do not apply to threatened species such as the argali in Kyrgyzstan, Mongolia, and Tajikistan.

Plaintiffs contend that they are nonetheless entitled to informational standing because they are challenging the Service's listing of the argali as threatened, rather than endangered, and because courts evaluating informational standing claims assume that plaintiffs will succeed on the merits. The cases Plaintiffs rely on, however, do not involve circumstances where the plaintiffs were not statutorily entitled to any information absent the court's assumption that they would succeed on the merits. *See Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Ethyl Corp. v. EPA,* 306 F.3d 1144, 1148 (D.C.Cir.2002); *In re Thornburgh,* 869 F.2d 1503, 1511 (D.C.Cir.1989).

Here, it is undisputed that Plaintiffs are not statutorily entitled to any information. Plaintiffs can only obtain the information they seek if they first establish that the argali are endangered, rather than threatened. Plaintiffs cannot use their claim that the argali should be listed as endangered to obtain standing to which they are otherwise not entitled.

Accordingly, because Plaintiffs have not alleged that they have been denied any information to which the ESA entitles them, the organizational Plaintiffs do not have standing.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is **denied,** Defendants' Motion for Summary Judgment is **denied as moot,** Intervenors Safari Club's Motion for Summary Judgment is **granted,** and Intervenors FNAWS' Motion for Summary Judgment is **granted.**

### *MEMORANDUM OPINION ON RECONSIDERATION*

On July 31, 2003, the Court granted Intervenors' Motions for Summary Judgment and denied Plaintiff's Motion for Summary Judgment, finding that Plaintiffs did not having standing because they had "failed to demonstrate that they will likely obtain redress from a favorable decision on the merits." Mem. Op. at 8. This matter is now before the Court on Plaintiffs' Motion for Reconsideration.

Plaintiffs have asked the Court to reconsider its conclusion that they lack standing based on their failure to meet the redressability requirement. However, their argument in the Motion for Reconsideration is basically no different than the argument they presented in their underlying Motion for Summary Judgment. The sole basis for their pending Motion is Plaintiffs' claim that it is likely that their injuries—based on harm to argali sheep—would be redressed if the Court were to issue "a ruling that imports [of argali sheep] must temporarily cease at least until [Mongolia, Tajikistan and Kyrgystan] can...develop sound argali conservation programs." Pls. Mot. for Reconsideration at 2.

Plaintiffs claim that if the United States stops issuing argali importation permits, these three countries will increase their conservation efforts in order to get the U.S. to re-issue these permits. However, Plaintiffs ignore the two primary pieces of evidence presented by Intervenors, which

show that decreased injury to argali sheep and increased conservation efforts would be unlikely if issuance of U.S. importation permits were enjoined as requested by Plaintiffs.

First, when the United Stated previously prohibited argali importation from Tajikistan from 1993–1996, the killing of argali sheep actually increased. This result occurred because hunting permits were bought at lower prices by non-U.S. hunters. The diminished revenues from the sale of hunting permits led, in turn, to increased argali poaching due to local villagers returning to poaching to support their families after losing their hunting camp jobs, and decreased employment of the game guards who stop argali poaching. *See* Ex. 1 to Intervenors Safari Club International *et al.*'s Opp'n, Decl. of Robert Kern at 2 ("Kern Decl.").

Second, argali conservation efforts will likely decrease if U.S. importation permits are withdrawn because these countries do not have excess governmental funds for argali conservation. *See* Decl. No. 9 to FNAW International *et al.*'s Opp'n to Pls.' Mot. for Summary J., Decl. of Raymond Lee at 2 ("Lee Decl.") ("If hunting programs [ ] are eliminated, the funding available for [ ] wildlife conservation programs would also be eliminated.... The revenues from U.S. hunting interest is both indispensable and irreplaceable.").

Plaintiffs argue that the Intervenors' affidavits actually support Plaintiffs' claims that these three countries have a great financial incentive to develop conservation programs once issuance of U.S. argali importation permits stops. However, Plaintiffs fail to suggest how these countries would fund such conservation efforts in the absence of revenue generated by selling hunting permits to U.S. hunters. *See* Kern Decl. at 3 ("These [three] developing countries are unable...to adequately fund argali management programs without assistance," and "substantial revenues earned through the sale of argali permits [to high paying U.S. hunters] are the largest single source for argali conservation and management"); *see also* Lee Decl. at 2.

Regardless of the *theoretical* economic incentives that these three countries may have for taking steps to maintain the issuance of U.S. argali importation permits, Plaintiffs provide no firm facts to dispute Intervenors' claims that cessation of the U.S. importation permits would actually lead to increased injury to argali sheep and decreased conservation efforts. While Plaintiffs can only speculate that "a decision granting the relief they ask will both eliminate the source of the harm they fear and prevent the injury from occurring," Intervenors have presented factual evidence showing it highly unlikely that "diminution in demand [for argali sheep by United States citizens] would correlate directly to the diminution in harm to plaintiffs." *Animal Protection Institute of America v. Mosbacher,* 799 F.Supp. 173, 177 and n. 7 (D.D.C.1992).

In sum, Plaintiffs have failed to "show that there is a substantial probability that, if the Court affords the relief requested, the injury will be removed." *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1009 (D.C.Cir.1977) (internal quotations and citations omitted). The Court concludes that Plaintiffs still fail to fulfill the redressability requirement of standing because they cannot show that it is highly likely "that the injury [to argali sheep] will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omit-

ted).[1]

Accordingly, upon consideration of the Motion, the Oppositions, and the Reply, and for the reasons stated above, Plaintiffs' Motion for Reconsideration is denied. An Order will issue with this Opinion.

---

**1.** Plaintiffs argue that their redressability and standing claims are supported by a new draft policy regarding issuance of permits for threatened and endangered foreign species recently issued by the U.S. Fish and Wildlife Service. *See* 68 Fed.Reg. 49,512 (Aug. 18, 2003). This ruling, concerning Plaintiffs' lack of standing under the facts of this case, has no applicability to the validity of this new draft policy.