# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 14, 2007                    Decided July 13, 2007

No. 06-5142

MIAMI BUILDING & CONSTRUCTION TRADES COUNCIL,
AFL/CIO AND
HOMESTEAD AIR BASE DEVELOPERS, INC.,
APPELLANTS

v.

SECRETARY OF DEFENSE *ET AL.*,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00067)

---

*Kevin S. O'Scannlain* argued the cause for the appellants.

*Ellen J. Durkee*, Attorney, United States Department of Justice, argued the cause for the appellees. *John Most* and *Lisa E. Jones*, Attorneys, were on brief. *Andrew C. Mergen*, Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and HENDERSON and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellants, the Miami Building & Construction Trades Council and the Homestead Air Base Developers, Inc., (collectively, HABDI) contracted with Miami-Dade County (Miami-Dade or County) to construct and operate a commercial airport on surplus land forming part of what was then Homestead Air Force Base (Homestead). HABDI challenges the decision of the U.S. Air Force (Air Force) not to convey the land to Miami-Dade for an airport, as previously planned, but instead to offer a portion of the land to the County for a non-aviation development. We conclude that HABDI lacks standing under Article III of the United States Constitution. Even were we to direct the Air Force to convey the total surplus acreage, we cannot predict with any confidence that Miami-Dade—which voluntarily terminated its participation in this lawsuit and, pursuant to an agreement with the Air Force, has already accepted a portion of the surplus property for mixed use development—would make the policy choice to reverse course and construct an airport, thus redressing HABDI's alleged injury, namely, the lost opportunity to build and operate a commercial airport on land conveyed by the Air Force for this purpose.

## I.

The Homestead property is located in southern Miami-Dade County, Florida near the towns of Homestead and Florida City and between Biscayne National Park to the east and Everglades National Park to the west. In March 1993, the United States Secretary of the Department of Defense (Secretary) recommended that Homestead be closed pursuant to the Defense Base Closure and Realignment Act of 1990 (DBCRA), Pub. L. No. 101-510 §§ 2901 *et seq.*, 104 Stat. 1485, 1496 (1990). After public hearings, the Defense Base Closure and Realignment Commission prepared a report recommending realignment rather than closure and the recommendation was approved by the

President and not disapproved by the Congress pursuant to DBCRA. The Air Force then decided to dispose of 1,631.8 acres of Homestead it did not need for its planned realignment of Homestead into the Homestead Air Reserve Station.

In July 1993, Miami-Dade submitted to the Air Force a draft redevelopment plan proposing that the Air Force transfer Homestead's surplus property to Miami-Dade by public benefit conveyance[1] for redevelopment as a commercial airport. In February 1994, the Air Force issued an environmental impact statement (EIS) on Miami-Dade's proposal. The EIS considered four alternative uses of the surplus property—three of which included a commercial airport (with varying additional facilities); the fourth was "No-Action." Record of Decision on the Disposal of Homestead Air Force Base, Dade County Florida (Oct. 1994) at 7-8 (JA 23-24). In October 1994, the Air Force issued a Record of Decision (ROD) which determined that certain parcels were to "be made available for disposal for use as a public airport" and Miami-Dade "w[ould] be offered the opportunity to apply for the property for public airport use." *Id*. at 13 (JA 29). The decision was contingent on Miami-Dade's submission of a qualifying application and approval thereof by both the Air Force and the Federal Aviation Administration (FAA). In addition, the ROD advised that "future economic, political, and environmental conditions could redirect development by the new owners toward other alternatives or means of implementation." *Id*. at 18 (JA 34).

---

[1] A public benefit conveyance is the transfer of "surplus real property . . . to State and local governments and certain non-profit institutions or organizations at up to 100 percent public benefit discount for public benefit purposes," including "education, health, park and recreation, the homeless, historic monuments, public airports, highways, correctional facilities, ports, and wildlife conservation." 41 C.F.R. § 102-75.350.

In September 1995 Miami-Dade entered an interim six-month lease with the Air Force for the proposed airport property while it prepared plans for airport development and operation. The interim lease recited: "The Lessee acknowledges that this Lease, and any extension of it, is not and does not constitute a commitment by the Government as to the disposal of the Leased Premises or of Homestead AFB, in whole or in part, to the Lessee or any agency or instrumentality thereof, or to any sublessee." Lease § 6.3 (JA 43). The interim lease was amended three times under the same terms and conditions, the last extension ending on March 31, 1997.

In June 1996, Miami-Dade entered a "Lease and Development Agreement" (Development Agreement) with HABDI, in which Miami-Dade agreed to lease the airport property to HABDI for a 45-year term and HABDI agreed to construct and operate a commercial airport, with Miami-Dade to receive a portion of the revenue. The Development Agreement provided:

> [T]he Lessee acknowledges that, because the County has no long-term leasehold or ownership interest in [the lease property] at this time, the terms of this Lease shall not be effective until such time as the County acquires a leasehold or fee simple interest in [the lease property] under the Long Term Lease or the Conveyance, as applicable, and not before
> . . . .

Development Agreement at 1 (JA 108).[2]

---

[2]Although conveyance of a fee simple interest was contemplated, the ROD specified that "[a]ny property which the Air Force is unable to convey by deed pending meeting environmental clean-up requirements, will be transferred by long-term lease with a contract to accept the property when all environmental remediations are in place." ROD at 13 (JA 29); *see also* Development Agreement at 2 (JA 109).

On December 31, 1996, Miami-Dade applied to the Air Force for the conveyance or long-term lease of the airport property. Meanwhile, the Air Force had received correspondence from environmental groups seeking a supplemental EIS because of significant expansion of HABDI's airport development plan—in particular, more extensive ground facilities and an almost two-fold increase in the projected commercial jet usage. Subsequently, the Air Force and the FAA, in cooperation with the Department of the Interior (Interior) and the Environmental Protection Agency (EPA), decided to conduct a supplemental EIS (SEIS). The final SEIS, issued in December 2000, considered four alternatives: (1) a commercial airport as previously proposed; (2) a spaceport; (3) a commercial, industrial, and/or residential "mixed use" development; or (4) "no action." SEIS §§ 2.2-2.5 (JA 275-356). In the SEIS, the Air Force stated a preference for either the proposed commercial airport or the mixed use alternatives, explaining that it did "not consider the potential environmental impacts of either of those alternatives to be disqualifying." *Id.* at 2.12-1 (JA 434). The FAA expressed "a stronger preference for the commercial airport proposal because it would provide needed additional airport capacity for south Florida" and it believed the development "c[ould] include appropriate environmental mitigation for the surrounding community, Biscayne Bay, and the national parks." *Id.* Both Interior and EPA expressed a preference for the mixed use alternative. *Id.*

On January 15, 2001, the Air Force issued a Second Supplemental Record of Decision (SROD), in which it "conclude[d] that the surplus property should not be conveyed for airport purposes." SROD, Disposal of Portions of the Former Homestead Air Force Base, Florida, at 5 (Jan. 15, 2001) (JA 441). The Air Force decided instead to retain Homestead's runway and taxiways and to offer Miami-Dade a smaller parcel (approximately 717 acres) "for mixed use development." *Id.* If Miami-Dade declined the offer, the Air Force planned to assign

the 717 acres to Interior which was to negotiate a transfer of the land (in exchange for property interests beneficial to Interior) to a party that would develop it for a mixed use or, failing that, the land was to be disposed of by public sale. *Id.* The Air Force explained it had "determined that the development of a commercial airport at the former Homestead AFB in such close proximity to Biscayne and Everglades National Parks, when development alternatives with lesser impacts are available, poses unacceptable risks to these national resources," noting it was "aware that other federal agencies believe that a commercial airport would not be consistent with the purposes of the Comprehensive Everglades Restoration Plan, authorized by P.L. 106-541." *Id.* at 7 (JA 443).[3]

On January 12, 2001, HABDI filed this action challenging the Air Force's decision to prepare an SEIS. HABDI filed an amended complaint on March 8, 2001 challenging the 2001 SROD itself, alleging the Air Force violated the DBCRA, the Base Closure Community Assistance Act of 1993, Pub. L. No. 103-160, §§ 2901 *et seq.*, 107 Stat. 1547, 1909 (1993), and the Due Process and Equal Protection Clauses of the Fifth Amendment to the United States Constitution. On March 16, 2001, Miami-Dade filed a similar suit which was voluntarily dismissed on December 13, 2001 after the County filed an application with the Air Force for conveyance of the Homestead property for mixed use development.

---

[3]Public Law 106-541 included a "Sense of Congress Concerning Homestead Air Force Base," which, *inter alia*, recognized that "development at the Homestead site could potentially cause significant air, water, and noise pollution and result in the degradation of adjacent national parks and other protected Federal resources." Water Resources Development Act of 2000, Pub. L. No. 106-541, § 602, 114 Stat. 2572, 2693 (2000).

On July 13, 2004, the Air Force and Miami-Dade entered an "Economic Development Conveyance"[4] agreement under which the Air Force agreed to convey 604 acres of the Homestead to Miami-Dade for mixed use (but non-aviation) development. As of February 16, 2006, the Air Force had delivered and Miami-Dade had accepted deeds for 580 acres of the property; an additional 24 acres were to be conveyed after environmental remediation.

On March 16, 2006, the district court granted summary judgment in favor of the Air Force for lack of jurisdiction on the ground the plaintiffs lacked standing or, alternatively, on the merits.[5] *Miami Bldg. & Constr. Trades Council v. Sec'y of Def.,* No. 01cv0067 (D.D.C. Mar. 16, 2006).

HABDI filed a notice of appeal on May 12, 2006.

## II.

"Because the question of standing goes to our jurisdiction over the case, we must consider it first." *AT&T Corp. v. FCC*, 317 F.3d 227, 237 (D.C. Cir. 2003) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94-95 (1998)). "The 'irreducible constitutional minimum of standing contains three

---

[4]An "economic development conveyance" is a "transfer [of] real property and personal property . . . for purposes of job generation on the installation," 32 C.F.R. § 174.9(a), for which "the Secretary concerned shall seek to obtain consideration at least equal to the fair market value," *id*. § 174.10(b), although a conveyance may be made without consideration under certain circumstances, *id*. § 174.10(e).

[5]On the merits, the district court concluded that the SEIS was performed in conformance with Air Force regulations, the SROD was not arbitrary or capricious and there was no record evidence to support HABDI's due process and equal protection claims. *See Miami Bldg. & Constr. Trades Council v. Sec'y of Def.,* No. 01cv0067, slip op. at 15-16 (D.D.C. Mar. 16, 2006).

elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235, 1240 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)) (other internal quotation omitted). Following our decision in *US Ecology, Inc. v. United States Department of the Interior,* 231 F.3d 20 (D.C. Cir. 2000), we conclude that the district court correctly held that HABDI lacks Article III standing because it has not demonstrated redressability.

In *US Ecology*, the State of California (California) had sought to purchase from Interior a parcel of federal land in the Mojave Desert (Ward Valley Site) for use as a low-level radioactive waste facility and, in connection with the purchase, had contracted with US Ecology to develop the site. Interior initially issued a ROD approving the sale but subsequently rescinded the ROD. California and US Ecology filed separate suits in the district court challenging the rescission. After the actions were consolidated, the district court granted summary judgment in Interior's favor. US Ecology appealed but the State of California did not. While US Ecology's appeal was pending, Interior sent California a letter advising it that Interior was terminating its purchase application.

On appeal we held that US Ecology lacked Article III standing based on its "most obvious failing—its inability to demonstrate that it is ' "likely," as opposed to merely "speculative," that [its] injury will be "redressed by a favorable decision." ' " *US Ecology*, 231 F.3d at 24 (quoting *Defenders of Wildlife,* 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 43 (1976))) (alteration in original). The court explained that the policy decision whether to go ahead with the purchase and development of the Ward Valley Site belonged entirely to the State of California and "[c]ourts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials"

because "the question of '[w]hether [appellant's] claims of economic injury would be redressed by a favorable decision [in such a] case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.' " *Id*. at 24 (quoting *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615 (1989)) (alteration in original). Thus, "[w]hen redress depends on the cooperation of a third party, 'it becomes the burden of the [appellant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.' " *Id*. at 24-25 (quoting *Defenders of Wildlife*, 504 U.S. at 562) (second alteration in original). The court concluded US Ecology had not met its burden because "even were the Department of the Interior to issue a [land patent transferring title of the Ward Valley Site to California] as US Ecology requests, only the State of California is capable of accepting title and taking ownership of the land." *Id*. at 25. We believe HABDI has failed to meet its burden for substantially the same reason.

Here, only Miami-Dade "is capable of accepting title and taking ownership of the land," *id*., and whether to reverse course and build an airport rather than the planned mixed use development is a policy decision only Miami-Dade can make. What its decision would be if offered—as originally—the full 1,631.8 acres to construct an airport is beyond the court's control or ken. It might, as HABDI insists, choose an airport or it might maintain its present course. Thus, like US Ecology, HABDI's "disappointment at having invested—and perhaps lost—time and money" in the proposed project, "without more, is not enough" to establish standing. *US Ecology*, 231 F.3d at 25. HABDI must also demonstrate redressability and, like US Ecology, has failed to do so.

HABDI attempts to distinguish this case from *US Ecology* but to no good effect. First, HABDI asserts that, unlike US Ecology, it possesses a "contingent legal right" to lease the original 1,631.8 acres to operate a commercial airport and the loss of this right constitutes a sufficient injury. We disagree. US Ecology, "seek[ing] refuge in a few lines of dicta found . . . in *University Medical Center of Southern Nevada v. Shalala,* 173 F.3d 438 (D.C. Cir. 1999)," claimed standing based on a legal right to develop the Ward Valley Site contingent on California's right to purchase the site from Interior. *Id.* "[A]ssuming" that a contingent legal right "poses a circumstance under which the redressability problem might be avoided," we found no such circumstance in that case because US Ecology had not demonstrated a "legally enforceable right" to compel California to "accept the Ward Valley Site if offered" or even "to develop the facility were California ultimately to pursue the Ward Valley Site." *Id.* Like US Ecology, HABDI too lacks the legal right to compel the potential land transferee—in this case, Miami-Dade—to accept the land transfer. The Development Agreement expressly provides that the terms of the lease—and consequently any rights HABDI may have thereunder— "shall not be effective until such time as the County acquires a leasehold or fee simple interest in [the lease property] under the Long Term Lease or the Conveyance, as applicable, and not before." Development Agreement at 1 (JA 108). And that time will not come unless and until Miami-Dade decides to accept the original acreage and proceed with airport development—events that may never occur. Thus, as in *US Ecology*, *see* 231 F.3d at 25, even assuming the contingent legal right theory could support redressability in the proper case—an issue we do not decide—this is not that case. *See id.* (rejecting US Ecology's "contingent legal right" claim).

HABDI also attempts to distinguish *US Ecology* factually, noting that in that case "the court found that the State chose not to appeal an adverse lower court decision amid concerns about

'the lack of funds to purchase the site,' 'the apparent lack of authority of [the State agency] to acquire land,' and 'substantial steps . . . required to proceed with the requested sale.' " Appellants' Br. at 14 (quoting *US Ecology*, 231 F.3d at 24) (alteration by appellants). This characterization, however, is not entirely accurate. The three quoted circumstances were not California's reasons for declining to appeal but instead Interior's reasons for terminating California's application after California had declined to appeal. *See US Ecology*, 231 F.3d at 23-24. In any event, there is no reason to believe that Miami-Dade is interested in proceeding with airport development rather than the planned mixed use development. Based on the record evidence, we cannot agree with HABDI that Miami-Dade's "preferred use" remains use as a commercial airport. *See* Appellants' Br. at 11.

Because the appellants have failed to demonstrate that their alleged injury is redressable in this proceeding, we conclude that they lack standing under Article III of the United States Constitution. Accordingly, the district court's summary judgment is affirmed.

*So ordered.*