BRISCOE, Chief Judge.
US Magnesium seeks review of a recent final rule from the United States Environmental Protection Agency (EPA). In its rule, the EPA has called for Utah to revise its State Implementation Plan (SIP) for the federal Clean Air Act (CAA). Under the CAA, the EPA may call for a state to revise its SIP (a SIP Call) if the EPA finds the state’s current SIP substantially inadequate. Here, the EPA determined that Utah’s SIP was substantially inadequate because it contains an Unavoidable Breakdown Rule (UBR), which permits operators of CAA-regulated facilities to avoid enforcement actions when they suffer an unexpected and unavoidable equipment malfunction. In-this SIP Call, published as a final rule in April 2011, the EPA requested that Utah promulgate a new UBR — one that conforms with the EPA’s interpretation of the CAA. U.S. Magnesium maintains that the SIP Call is arbitrary and capricious and asks this court to vacate it. We have exclusive jurisdiction under CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1), and we deny the petition for review.
I

A. CAA framework.

The CAA uses a cooperative-federalism approach to regulate air quality. The EPA promulgates National Ambient Air Quality Standards (NAAQS) for six airborne pollutants, CAA § 109, 42 U.S.C. § 7409, with acceptable pollution levels based on human health and welfare. Areas meeting the NAAQS are termed attainment areas, and areas not meeting the NAAQS are termed nonattainment areas. States create their own SIPs to bring non-attainment areas into compliance with the NAAQS and to prevent deterioration of air quality in attainment areas. -CAA §§ 107 & 110, 42 U.S.C. §§ 7407 & 7410. The EPA reviews each SIP and then may approve a SIP through notice-and-comment rulemaking. CAA §§ 110(c). & (k)(3), 42 U.S.C. §§. 7410(c) & (k)(3). Approved SIPs are enforceable as federal law and may be enforced by the state, the EPA, or individuals under the CAA citizen-suit provision. CAA §§ 110(a)(1), 113, 304; 42 U.S.C. §§ 7410(a)(1), 7413, 7604. The EPA directly administers the CAA in states without an approved SIP.
*1160 The EPA directly regulates several kinds of air emissions. First, the EPA regulates hazardous air pollutants by establishing National Emission Standards for Hazardous Air Pollutants (NESHAPs), which apply directly to all sources of air pollutants. The NESHAPs are technology-based standards, based on the Maximum Achievable Control Technology (MACT) for each hazardous air pollutant. The EPA also directly regulates new sources of air pollution through technology-based New Source Performance Standards (NSPS). In attainment areas— those areas where air quality meets the NAAQS — the NSPS requires installation of the Best Available Control Technology (BACT). In nonattainment areas, where the air quality does not meet NAAQS, the EPA requires that new sources emit at the Lowest Achievable Emission Rate (LAER). Utah has incorporated these rules into its air-quality standards by reference in order to receive a general delegation of CAA implementation authority for its SIP. See Utah Admin. Code r. 307-210 & r. 307-214.
The EPA may require a state to alter an approved SIP if it finds, through notice- and-comment rulemaking, that the SIP “is substantially inadequate to attain or maintain the relevant [NAAQS] ... or to otherwise comply with any requirement of [the CAA].” CAA § 110(h)(5), 42 U.S.C. § 7410(k)(5). If the EPA determines that a SIP is substantially inadequate, it calls for revision of the SIP through a SIP Call. CAA §§ 110(a)(2)(H) & (k)(5), 42 U.S.C. §§ 7410(a)(2)(H) & (k)(5). A state’s failure to respond to the SIP Call can result in a federal takeover of CAA implementation in the state and the loss of significant federal funds.

B. Utah SIP.

The EPA approved Utah’s current SIP in 1980. 45 Fed.Reg. 10761, 10763 (Feb. 19,1980). Utah contains attainment areas, nonattainment areas, and nonattainment areas that have come into compliance with the NAAQS, which are called maintenance areas. As relevant to this litigation, Utah’s SIP contains a UBR exemption, Utah Admin. Code r. 307-107-1, which states that “emissions resulting from an unavoidable breakdown will not be deemed a violation of these regulations.” The Utah UBR applies to “all regulated pollutants,” id., which includes NESHAPs and the pollutants governed by the NAAQS and NSPS.
The UBR requires that
[t]he owner or operator of an installation suffering an unavoidable breakdown shall assure that emission limitations and visible emission limitations are exceeded for only as short a period of time as reasonable. The owner or operator shall take all reasonable measures which may include but are not limited to the immediate curtailment of production, operations, or activities at all installations of the source if necessary to limit the total aggregate emissions from the source to no greater than the aggregate allowable emissions averaged over the periods provided in the source’s approval orders or [Utah code]. In the event that production, operations or activities cannot be curtailed so as to so limit the total aggregate emissions without jeopardizing equipment or safety or measures taken would result in even greater excess emissions, the owner or operator of the source shall use the most rapid, reasonable procedure to reduce emissions.
Id. at r. 307-107-4. The UBR further provides that
[a] breakdown for any period longer than 2 hours must be reported to the [Utah] executive secretary.... Within 7 calendar days of the beginning of any breakdown of longer than 2 hours, a *1161 written report shall be submitted to the executive secretary which shall include the cause and nature of the event, estimated quantity of pollutant (total and excess), time of emissions and steps taken to control the emissions and to prevent recurrence. The submittal of such information shall be used by the executive secretary in determining whether a violation has occurred and/or the need of further enforcement action.
Id. at r. 307-107-2.

C. Current EPA rulemaking.

The EPA approved Utah’s UBR as part of the state’s SIP in 1980, albeit with the caveat that exemptions under the UBR “may not be approved by the EPA.” 45 Fed.Reg. 10761, 10763 (Feb. 19, 1980). When the EPA approved Utah’s UBR, the EPA had not yet developed its own policy on emissions during equipment malfunctions; it released the first version of its policy in 1982. The EPA updated its policy several times: first in 1983, then in 1999 (the Herman Memorandum), and most recently in 2001 (the Schaeffer Memorandum). The EPA’s equipment-malfunction policy sets out its interpretation of the CAA’s requirements with respect to malfunctions, but it is only a policy statement, has not undergone notiee-and-comment rulemaking, and does not have the force of law. Ariz. Pub. Serv. Co. v. U.S. E.P.A., 562 F.3d 1116, 1130 (10th Cir.2009). Nevertheless, we approved the EPA’s policy statement in Arizona Public Service Co., noting that “[w]e defer to the EPA’s longstanding policy, for the policy is a reasonable interpretation of the Clean Air Act.” Id.
After the EPA updated its policy in 1999, it asked Utah to address several concerns with the Utah UBR, and Utah’s Division of Air Quality (UDAQ) agreed that the UBR would benefit from clarification. Utah proposed an amended rule in 2004, but the EPA notified Utah that the EPA could not approve a SIP that included the proposed amendment. Ultimately, in 2008, the Utah Air Quality Board decided to leave the UBR unchanged. In response, in 2010, the EPA published, a notice of proposed rulemaking proposing to find the Utah SIP substantially inadequate due to its continued inclusion of the UBR. Although UDAQ opposed the proposed rule, EPA nevertheless published the SIP Call as a final rule in April 2011, and Utah has since agreed to revise the UBR.
When it promulgated the final rule, the EPA provided three primary justifications for its finding that the Utah SIP was substantially inadequate. First, the EPA found that the UBR “[d]oes not treat all exceedances of SIP and permit limits as violations,” which could preclude injunctive relief. Joint Appendix (JA) at 2. The EPA reasoned that
[t]his generic exemption, applicable to all Utah SIP limits, precludes any enforcement when there is an unavoidable breakdown. Our interpretation of the CAA is that an exemption from injunctive relief is never appropriate, and that an exemption from penalties is only appropriate in limited circumstances. Contrary to CAA section 302(k)’s definition of emission limitation, the exemption in the UBR renders emission limitations in the Utah SIP less than continuous and, contrary to the requirements of CAA sections 110(a)(2)(A) and (C), undermines the ability to ensure compliance with SIP emissions limitations relied on to achieve the NAAQS and other- relevant CAA requirements at all times. Therefore, the UBR renders the Utah SIP substantially inadequate to attain or maintain the NAAQS or to comply with other CAA requirements....
Id. at 3.
Second, the EPA determined that the UBR “could be interpreted to grant the *1162 Utah executive secretary exclusive authority to decide whether excess emissions constitute a violation.” Id. at 2. The EPA explained:
This provision appears to give the [Utah UDAQ] executive secretary exclusive authority to determine whether excess emissions constitute a violation and thus to preclude independent enforcement action by EPA and citizens when the executive secretary makes a non-violation determination. This is inconsistent with the enforcement structure under the CAA, which provides enforcement authority not only to the States, but also to EPA and citizens. Because a court could interpret section R307-107-2 as undermining the ability of EPA and citizens to independently exercise enforcement discretion granted by the CAA, it is substantially inadequate to comply with CAA requirements related to enforcement. Because it undermines the envisioned enforcement structure, it also undermines the ability of the State to attain and maintain the NAAQS and to comply with other CAA requirements related to PSD, visibility, NSPS, and NESHAPS. Potential EPA and citizen enforcement provides an important safeguard in the event a State cannot or does not enforce CAA violations and also provides additional incentives for sources to design, operate, and maintain their facilities so as to meet their emission limits. Thus, R307-107-2 renders the SIP substantially inadequate to attain or maintain the NAAQS or otherwise comply with the CAA.
Id. at 3.
Third, the EPA found that the UBR “improperly applies to Federal technology-based standards such as [NSPS and NESHAPS].” Id. at 2. These standards, developed by the EPA, already contain exemptions for breakdowns, and the EPA believes that states should not be able to add additional exemptions. The EPA found that
[the UBR] also applies to Federal technology-based standards like the NSPS and NESHAPS that Utah has incorporated by reference to receive delegation of Federal authority. To the extent any exemptions from these technology-based standards are warranted for malfunctions, the Federal standards contained in EPA’s regulations already specify the appropriate exemptions. No additional exemptions (or criteria for deciding whether an applicable exemption applies) are warranted or appropriate. Thus, the Utah SIP is substantially inadequate because [the UBR] improperly provides an exemption and criteria not contained in and not sanctioned by the delegated Federal standards.
Id. at 3.
In its rulemaking, the EPA also referred to its longstanding policy on emissions during equipment malfunctions. Under the heading “Why is EPA proposing a SIP Call?” in the proposed rule, the EPA states that the UBR “contains various provisions that are inconsistent with EPA’s interpretations [expressed in the longstanding policy] regarding the appropriate treatment of malfunction events in SIPs and which render the Utah SIP substantially inadequate. As a result, we are calling for a SIP revision.” Id. at 17. The final rule also cited to the EPA’s longstanding policy to explain in more detail the reasoning behind all three of the EPA’s primary arguments for the rule. Id. at 4, 5, 7. But despite the numerous citations to its longstanding policy, the EPA does not appear to have relied directly on its longstanding policy to justify its SIP Call. In response to the comment that:
EPA lacks the regulatory authority to make a SIP Call based on policy or guidance that has not become applicable *1163 law. The [Herman Memorandum] EPA cites as justification for the SIP Call has never been subjected to the legal requirements of notice and public rule-making under the Administrative Procedures Act,
id. at 6, the EPA argued that
[the Herman Memorandum]' reflects our interpretation of the CAA. We have not treated it as binding on the States or asserted that it changed existing SIP provisions. Instead, we have done what commenters argue is necessary — we have engaged in notice and comment rulemaking to determine whether a-SIP Call is appropriate in this case. Through this rulemaking action, we have evaluated provisions of the Utah SIP to determine whether they are consistent with our interpretation of the CAA as reflected in our policies. We provided commenters with the opportunity to comment on the proposed SIP Call and our basis for it, and are only finalizing the SIP Call after carefully considering commenters’ comments. To the extent some commenters may be arguing that we must conduct national rulemaking on our policy before we can conduct SIP Call rulemaking with respect to a specific State malfunction provision, we find no basis for this assertion in the CAA. We have evaluated the UBR, found it substantially .inadequate as specified in the CAA, and issued a SIP Call as required. The process we have followed and the substance of our action are reasonable.
Id. at 6-7.
Finally, the EPA addressed the question of whether it was required to make a specific factual finding to support the SIP Call:
The thrust of several comments is that we have not presented facts or empirical evidence that the UBR is not working or that shows [sic] any measured or modeled impact on attainment or maintenance of a NAAQS due to excess emissions resulting from an unavoidable breakdown. As we indicated in our proposal (see 75 FR 70892), we need not show a direct causal link between any specific unavoidable breakdown excess emissions and violations of the NAAQS to conclude that the SIP is substantially inadequate. It is our interpretation that the fundamental integrity of the CAA’s SIP process and structure is undermined if emission limits relied on to meet CAA requirements can be exceeded without potential recourse' by any entity granted enforcement authority by the CAA. We are not restricted to issuing SIP Calls only after a violation of the NAAQS has occurred or only where a specific violation can be linked to a specific excess emissions event. It is sufficient that emissions limits to which the unavoidable breakdown exemption applies have been, are being, and will be relied on to attain and maintain the NAAQS and meet other CAA requirements.
Id. at 5. Although it maintained that it need not make a factual showing the UBR resulted in NAAQS violations, the EPA nevertheless provided some information about the magnitude of emissions released during malfunctions, which demonstrated that releases during malfunction can be significant, with one plant releasing three times its daily limit of sulphur dioxide over a nine-hour period. These examples show no NAAQS violations resulting from the UBR, but they do not purport to do so; instead, they show the potential magnitude of releases related to breakdowns.
II
After the EPA promulgated its final rule, U.S. Magnesium timely filed this petition. US Magnesium makes three primary arguments:
*1164 1. “EPA’s SIP Call is arbitrary and capricious because EPA failed to support its conclusion that the UBR rendered the Utah SIP substantially inadequate with sufficient facts in the administrative record.” Pet. Br. at i.
2. “EPA’s SIP Call is arbitrary and capricious because EPA relied exclusively on policy statements that have not been adopted through rulemaking procedures.” Id.
3. “EPA’s SIP Call is arbitrary and capricious because it is inconsistent with its own policy statements and regulations.” Id. at iii.
In response, the EPA argues that U.S. Magnesium lacks standing, that the EPA’s interpretation of the CAA should be upheld under Chevron deference, Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and generally that U.S. Magnesium’s arguments lack merit.

A. Standard of review.

The parties agree that our review of the SIP Call is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706. Under the APA, “we will not set aside agency action unless it is procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.” Ariz. Pub. Serv. Co., 562 F.3d at 1122 (internal quotation marks and citations omitted). Agency action is arbitrary or capricious “if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Id. at 1122-23 (internal quotation marks and citations omitted). Our inquiry is “searching and careful, [but] our review is ultimately a narrow one.” Maier v. EPA, 114 F.3d 1032, 1039 (10th Cir.1997).
“We review the EPA’s interpretation of the Clean Air Act, a statute it administers, under the standard set forth in Chevron. If the statute is clear, we apply its plain meaning and the inquiry ends. If the statute is silent or ambiguous about the question at issue ..., we defer to the authorized agency and apply the agency’s construction so long as it is a reasonable interpretation of the statute.” Ariz. Pub. Serv. Co., 562 F.3d at 1122 (internal quotation marks and citations omitted).

B. US Magnesium has standing to pursue this petition for review.

 Before addressing whether U.S. Magnesium has standing, we must first determine whether we can consider the declaration of Bryce Bird, Director of UDAQ (Bird Declaration), which U.S. Magnesium attached to its reply brief.[1] Generally, parties petitioning for review of agency decisions may only rely on evidence in the administrative record, but, as we have recognized, “[b]ecause Article Ill’s standing requirement does not apply to agency proceedings, [US Magnesium] had no reason to include facts sufficient to establish standing as a part of the administrative record.” Qwest Commc’ns Int’l v. FCC, 240 F.3d 886, 892 (10th Cir.2001) (citing Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1527-28 (9th Cir.1997)). We have not addressed this specific issue, but the Supreme Court seems to anticipate that litigants in a similar position could supplement the record:
*1165 We strongly suggest that in future cases parties litigating in this Court under circumstances [in which the case originated in a court not subject to Article Ill’s requirements] take pains to supplement the record in any manner necessary to enable us to address with as much precision as possible any question of standing that may be raised.
Pennell v. City of San Jose, 485 U.S. 1, 8, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); see also Qwest Commc’ns Int’l, 240 F.3d at 892-93. Further, the Ninth Circuit considered a similar issue in Northwest Environmental Defense Center, and held that “[b]eeause standing was not at issue in earlier proceedings, ... petitioners in this case were entitled to establish standing anytime during the briefing phase. We consider the affidavits solely to determine whether petitioners have standing to bring this action.” 117 F.3d at 1528. Finally, the United States Code section giving us original jurisdiction in this matter seems to anticipate that the reviewing court may allow additional evidence in some circumstances, although it does not directly address this situation. CAA § 307(c), 42 U.S.C. § 7607(c) (discussing when a court may allow the EPA administrator to consider additional evidence already admitted by the court). Based on the Supreme Court’s statement, as well as the persuasive decision by the Ninth Circuit and the legislative suggestion that additional evidence is admissible in these cases, we accept the Bird Declaration for the sole purpose of determining whether U.S. Magnesium has standing to bring this challenge.
A party has standing to pursue a claim in federal court only if: (1) it suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) that injury is fairly traceable to the .challenged action of the defendant rather than some third party not before the court; and (3) that injury is likely to be redressed by a favorable decision.
Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1144 (10th Cir.2010) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (internal quotations marks omitted).[2] US Magnesium owns a facility regulated under the Utah SIP and states that it has relied on the UBR to avoid regulatory liability in the past, such that a revised SIP, as required by the SIP Call, would not provide it with the same protection from liability that it currently enjoys. Thus, U.S. Magnesium meets the injury-in-fact and causa *1166 tion prongs of the standing inquiry. But the EPA challenges the redressability prong, arguing that Utah is an independent actor, not a party to this action, and that U.S. Magnesium failed to show that “Utah will abandon its revision of the [UBR] if U.S. Magnesium were to prevail on the merits here.” Res. Br. at 22.
 When, as in this APA action, “the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.” Lujan, 504 U.S. at 562, 112 S.Ct. 2130 (internal quotation marks omitted). “In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create ‘a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.’ ” Klamath Water Users Ass’n v. F.E.R.C., 534 F.3d 735, 739 (D.C.Cir.2008) (citing Utah v. Evans, 536 U.S. 452, 464, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002)); Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (“it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision”) (citations and internal quotations omitted). When redressibility depends on a third party and there is no evidence suggesting a likelihood that the third party will take the action necessary to afford the plaintiff relief, the plaintiff lacks standing. For example, in US Ecology, Inc. v. U.S. Dep’t of the Interior, 231 F.3d 20 (D.C.Cir.2000), the plaintiff sued the Interior Department for refusing to transfer federal land to the state of California — land the plaintiff planned to use to build a waste facility. The D.C. Circuit noted that even if Interi- or’s refusal were wrongful, the plaintiffs “alleged injury would not be redressable unless and until California accepted transfer of the disputed land and elected to proceed with the ... project.” Id. at 21. Because “[o]n the record at hand, [the plaintiff had] no grounds upon which to claim that California [would] follow these courses,” the court dismissed the case for lack of standing. Id.
Conversely, “[t]here will, of course, be occasions on which an order directed to a party before the court will significantly increase the chances of favorable action by a non-party.” Klamath Water Users, 534 F.3d at 739. In National Parks Conservation Ass’n v. Manson, 414 F.3d 1, 6 (D.C.Cir.2005), the D.C. Circuit held that “a district court order setting aside [an agency’s nonbinding letter] would significantly affect [the state’s] ongoing proceedings,” in that the state would consider and likely be influenced by the letter. “That is enough to satisfy redressability.” Id. at 6-7. Thus, if a party can show that a favorable decision is likely to redress them injury — that is, a favorable decision would significantly increase the chances of favorable action by a non-party — the party has standing to pursue its claim.
Under this standard, U.S. Magnesium adequately demonstrated its standing through the Bird Declaration, wherein the Director of UDAQ states that, “if this Court were to invalidate EPA’s SIP Call, there would be no need for UDAQ to revise the UBR and the existing UBR could be left in place.” Pet. Reply Br. at 31. The Bird Declaration does not explicitly say that UDAQ would necessarily abandon its effort to revise the UBR if we were to invalidate the SIP Call. But the Bird Declaration, coupled with Utah’s stated opposition to the SIP Call, strongly suggests that the SIP Call will significantly affect Utah’s decision to revise the UBR. Moreover, U.S. Magnesium need not show that Utah would not proceed with the UBR reform absent the SIP Call. Even if Utah would proceed, the evidence suggests that Utah would likely adopt a different *1167 UBR if the EPA were not forcing its hand. Indeed, Utah already tried to adopt a new UBR, which the EPA rejected. Because the SIP Call significantly affects Utah’s decision-making process, and because we find that a decision overturning the SIP Call would significantly increase the chances of action by Utah that is favorable to U.S. Magnesium, we hold that U.S. Magnesium has standing in this case.

C. The Administrative Record adequately supports the EPA’s conclusion that the UBR rendered the Utah SIP substantially inadequate.

US Magnesium argues that the EPA generally failed to support the SIP Call with adequate facts in the record. To support this argument, U.S. Magnesium argues that the CAA’s language, requiring the EPA to find a SIP “is substantially inadequate to attain or maintain the relevant [NAAQS] ... or to otherwise comply with any requirement of [the CAA]” before issuing a SIP Call, 42 U.S.C. § 7410(k)(5), requires the EPA to set out facts showing that the UBR has prevented Utah from attaining or maintaining the NAAQS or otherwise complying with the CAA.[3] U.S. Magnesium goes on to argue that the EPA failed to set forth such facts, and thus the rulemaking was arbitrary and capricious.
In response to U.S. Magnesium’s' core argument that the EPA was required to set out specific facts supporting its finding of substantial inadequacy, the EPA states that it need not identify particular facts, as long as it could make a general showing that the SIP failed “to attain or maintain the NAAQS or otherwise comply with all other CAA requirements.” Res. Br. at 24. This is in keeping with the EPA’s reasoning in its SIP Call; in its proposed rule, the EPA stated that it interpreted 42 U.S.C. § 7410(k)(5) to allow a SIP Call if the EPA determined that aspects of the SIP undermined the fundamental integrity of the CAA’s SIP process and structure, regardless of whether or not the EPA could point to specific instances where the SIP allowed violations of the NAAQS.
We analyze the EPA’s interpretation of 42 U.S.C. § 7410(k)(5), a statute it is charged with administering, under the Chevron standard. 467 U.S. at 837, 104 S.Ct. 2778. Proceeding under the first prong of Chevron, the statute is ambiguous about the question at issue. Ariz. Pub. Serv. Co., 562 F.3d at 1122 (internal quotation marks and citations omitted). On it face, the statute says nothing about whether the agency is required to make a specific factual finding about a state’s current SIP before calling the SIP. Moreover, the legislative history does not clarify the statute. Although U.S. Magnesium cites some legislative history purporting to show that Congress expected the EPA to make specific factual findings, that legislative history came from passage of the 1970 CAA, which did not have a section equivalent to CAA § 110(k)(5), 42 U.S.C. § 7410(k)(5). That section was added as part of the 1990 CAA amendments, so the 1970 legislative history is inapposite.
Because the statute is ambiguous, we turn to - the second prong of Chevron, where we -defer to the authorized agency and apply the agency’s construction so long as it is a reasonable interpretation of the statute. Ariz. Pub. Serv. Co., 562 F.3d *1168 at 1122. Certainly, a SIP could be deemed substantially inadequate because air-quality records showed that actions permitted under the SIP resulted in NAA.QS violations, but the statute can likewise apply to a situation like this, where the EPA determines that a SIP is no longer consistent with the EPA’s understanding of the CAA. In such a case, the CAA permits the EPA to find that a SIP is substantially inadequate to comply with the CAA, which would allow the EPA to issue a SIP Call under CAA § 11000(5), 42 U.S.C. § 7410(k)(5). And if the CAA does not require specific factual findings to support a SIP Call, then the EPA was not derelict in failing to provide specific factual findings to support the SIP Call in this case. Thus, we reject U.S. Magnesium’s argument that the administrative record does not adequately support the EPA’s conclusion that the Utah SIP is substantially inadequate.

D. The EPA’s purported reliance on policy statements not adopted through rulemaking procedures does not render the SIP Call arbitrary and capricious.

Next, U.S. Magnesium argues that
EPA treated the [Herman Memorandum] as if it were a legislative rule, binding upon the states and enforceable against the regulated industry. Such treatment is arbitrary and capricious in that the [Herman Memorandum] has never been elevated to the status of a rule through notice-and-comment rule-making.
Pet. Br. at 32. The EPA responded by agreeing that its Herman Memorandum was a nonbinding policy statement, not a legislative rule, and then by arguing that it treated the memorandum as a policy statement and did not rely on it in the rulemaking other than as a statement of the EPA’s interpretation of the CAA. This approach is consistent with the EPA’s statements in the final rule, where it stated that “[w]e have not treated [the memorandum] as binding on the States or asserted that it changed existing SIP provisions. Instead, we have done what commenters argue is necessary — we have engaged in notice and comment rulemaking to determine whether a SIP Call is appropriate in this case.” JA at 6-7. As outlined in the discussion of the rulemaking above, the EPA referenced the policy statements to explain its interpretation of the CAA, but did not attempt to rely on the statements as a rule of law in their own right. This is in keeping with our precedent. AMREP Corp. v. FTC, 768 F.2d 1171, 1179 (10th Cir.1985) (“General policy statements ... are merely public pronouncements of the policy that the agency plans to follow in rule-makings or adjudications____ It is only when a new standard set forth in a policy statement is adopted in a formal rule-making or adjudication that it becomes a binding norm.”).
More broadly, the EPA did not, as U.S. Magnesium alleges, merely rely on its own policy statements in determining that the UBR rendered the SIP substantially inadequate to comply with the CAA. As noted in the rule discussion, the EPA clearly explained its reasoning in determining that the UBR did not comport with the EPA’s understanding of the CAA requirements. The EPA’s references to its policy statements do not vitiate this explanation.
Finally, we approved of similarly limited reliance on the policies at issue here in Arizona Public Service Co., 562 F.3d at 1129 (deferring to the Herman Memorandum, which the EPA relied on to justify, in part, the rejection of a proposed malfunction exemption plan from the Arizona Public Service Co.). Likewise, in the present case the EPA did not inappropriately rely on its policy statements.

*1169
E. The EPA’s SIP Call is not inconsistent with its own policy statements and regulations.

US Magnesium’s final argument is that the EPA’s SIP Call is arbitrary and capricious because the EPA: (1) failed to follow the Schaeffer Memorandum’s limits on the Herman Memorandum; (2) failed to acknowledge that the UBR is actually consistent with the Herman Memorandum; and (3) failed to acknowledge that the UBR is consistent with the EPA’s own breakdown regulations. These arguments also fail.
The Schaeffer Memorandum states that the Herman Memorandum “was not intended to alter the status of any existing malfunction, startup or shutdown provision in a SIP that has been approved by the EPA.... Rather, it is in the context of future rulemaking actions, such as the SIP approval process, that the EPA will consider the Guidance and the statutory principles on which the Guidance is based.” JA at 131. From this language, U.S. Magnesium surmises that the Schaeffer Memorandum forbids the UBR’s alleged inconsistency with the CAA interpretation expressed in the Herman Memorandum from justifying a SIP Call. As the EPA suggests, this argument is specious. The EPA is not suggesting that the Herman Memorandum altered the law. Instead, the EPA has promulgated a new SIP Call, through notice-and-comment rulemaking, that applies the statutory interpretation first embodied in the Herman Memorandum to the Utah UBR. This appears to be the kind of use of the Herman Memorandum that the Schaeffer Memorandum envisioned when it stated that “it is in the context of future rulemaking actions, such as the SIP approval process, that the EPA will consider the Guidance and the statutory principles on which the Guidance is based.” Id. at 131; see Sierra Club v. Ga. Power Co., 443 F.3d 1346, 1353-55 (11th Cir.2006) (noting that, “[i]f the EPA believes that its- current interpretation of the Clean Air Act requires Georgia to modify its [Breakdown] Rule, the EPA should require the state to revise its SIP to conform to EPA policy”). The EPA’s actions here were not inconsistent with the Schaeffer Memorandum.
US 'Magnesium next argues that the EPA failed to acknowledge that the UBR is actually consistent with the Herman Memorandum. US Magnesium makes three specific arguments about the EPA’s conclusions: (1) the EPA’s reasoning in the final rule that the UBR may not exclude from exemption recurring breakdowns due to inadequate design, operation, or maintenance of air-quality controls is merely speculative; (2) the EPA incorrectly argues that the UBR does not indicate who bears the burden of proof regarding claims that a breakdown was unavoidable; and (3) the EPA incorrectly concludes that the UBR may be read to give the UDAQ secretary the exclusive authority to determine whether a violation has occurred. All three arguments turn on whether the EPA should have the power to call a SIP in order to clarify language in the SIP that could be read to violate the CAA, when a court has not yet interpreted the language in that way.
In its final rule, the EPA cites several cases where a court has interpreted provisions in a SIP to limit the EPA’s CAA enforcement authority in the face of more generous state standards. JA at 10 n. 20 (citing United States v. Ford Motor Co., 736 F.Supp. 1539 (W.D.Mo.1990); United States v. General Motors Corp., 702 F.Supp. 133 (N.D.Tex.1988) (EPA could not pursue direct enforcement of SIP emission limits where states had approved alternative limits under procedures EPA had approved in the SIP); Fla. Power & Light Co. v. Costle, 650 F.2d 579, 588 (5th Cir.1981). (EPA to be accorded no discre *1170 tion in interpreting state law)). The EPA stated, “[w]hile we do not agree with the holdings of these cases, we think the reasonable course is to eliminate any uncertainty about reserved enforcement authority by requiring the State to revise or remove the unavoidable breakdown rule from the SIP.” JA at 10 n. 20. In light of the potential conflicts between Utah’s SIP and the EPA’s reasonable interpretation of the CAA requirements, seeking revision of the SIP was prudent, not arbitrary or capricious.
Finally, U.S. Magnesium argues that the EPA failed to acknowledge that the UBR is consistent with the EPA’s own breakdown regulations in the NSPS and that the EPA’s position with respect to Sierra Club v. EPA 551 F.3d 1019 (D.C.Cir.2008), precludes the EPA’s efforts to use that case to support the SIP Call. Neither argument is credible.
First, as the EPA notes in its response, the NSPS standards are technology-based, while the NAAQS standards addressed in the SIP are health-based. In the past, the EPA had a policy allowing exemptions for technology-based standards, but not for health-based standards. However, the EPA has now begun promulgation of new rules to eliminate the technology-based breakdown exemptions, in light of the D.C. Circuit’s ruling that the CAA requires continuous compliance with some NSPS emission standards, such that the breakdown exemption was illegal under the CAA. Id. Because the EPA has abandoned its former interpretation, any inconsistency between EPA’s former breakdown exemptions and this SIP Call does not render the call arbitrary and capricious.
Second, U.S. Magnesium argues that the EPA’s use of Sierra Club to support the SIP Call is inconsistent with the EPA’s views on Sierra Club. This may have been true with respect to the EPA’s initial views on Sierra Club, but it no longer appears to be the case. In Sierra Club, the D.C. Circuit held that the CAA requires continuous compliance with MACT emission standards, striking down an EPA rule that created a breakdown exemption to the MACT standards. US Magnesium cites to a letter from an EPA official narrowly construing Sierra Club as only applying to the regulations at issue in that case, arguing that this narrow construction suggests that the EPA did not believe that Sierra Club had any impact on rules like the UBR at issue here. US Magnesium suggests that this conflicts with the EPA’s arguments in the SIP Call, where the EPA maintained that Sierra Club requires all emissions limitations to be continuous. However, the EPA’s promulgation of new NSPS rules based on the Sierra Club decision suggests it now accepts Sierra Club’s broader implication — that all emission limitations must be continuous. Indeed, the letter from the EPA official quoted by U.S. Magnesium went on to discuss the EPA’s intention to evaluate other standards in light of Sierra Club. Thus the EPA’s present position on Sierra Club is consistent with its SIP Call.
Ill
Accordingly, we DENY U.S. Magnesium’s petition for review of the Utah SIP Call.

. The parties have not addressed the issue of supplementing the administrative record in their briefs, although both parties seek to supplement the record.

. We note that the EPA has issued the SIP Call as a final rule in this case, rendering inapposite those cases holding that a SIP Call absent a final rule is not ripe for challenge. Compare Greater Cincinnati Chamber of Commerce v. U.S. E.P.A., 879 F.2d 1379, 1381 (6th Cir.1989) (holding that the EPA's SIP Call, which consisted of informing the state’s Governor and publishing a notice in the federal register, had no regulatory effect, making the issue unripe), Illinois v. U.S. E.P.A., 621 F.2d 259, 261 (7th Cir.1980) (holding that a "notice of deficiency issued by [the EPA] to state of Illinois with respect to a state plan for implementation, maintenance and enforcement of air quality standards ... did not have a sufficient impact on parties to give rise to a case in controversy with respect to state's challenge to the notice”), and Mont. Sulphur & Chem. Co. v. U.S. E.P.A., 666 F.3d 1174, 1183 (9th Cir.2012) (holding that a SIP call that is not a final rule "is not a final agency action and [does] not impose any specific obligations”), with Virginia v. E.P.A., 108 F.3d 1397, 1414 (D.C.Cir.1997) (reviewing a SIP Call where the call took the form of a final rule), and W. Va. Chamber of Commerce v. Browner, No. 98-1013, 1998 WL 827315, at *4 (4th Cir. Dec. 1, 1998) (unpublished) (holding that, because the EPA had issued a SIP Call as a final rule, "[t]here has now been final agency action; the case is now ripe for review”).

. US Magnesium also argues that the EPA failed to define the term "substantially inadequate,” but it raises this argument for the first time in its opening brief. Because U.S. Magnesium did not raise this argument in its comments on the proposed rule, it cannot raise it now. Wilson v. Hodel, 758 F.2d 1369, 1373 (10th Cir.1985) ("[A] reviewing court will not consider contentions which were not pressed upon the administrative agency.”); see also Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 783 (10th Cir.2006).