**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 24, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

ROBERT UKEILEY,

Petitioner,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; and ANDREW
WHEELER,[*] Acting Administrator,
United States Environmental
Protection Agency,

Respondents.

No. 16-9556

---

**APPEAL FROM THE UNITED STATES**
**ENVIRONMENTAL PROTECTION ADMINISTRATION**
**(AGENCY NO. EPA-R08-OAR-2015-0042)**

---

Vincent P. Calvano, Vincent P. Calvano, LLC, Boulder, Colorado, for Petitioner.

Allan D. Greenberg, Attorney, Environment & Natural Resources Division
(Jeffrey H. Wood, Acting Assistant Attorney General, United States Department
of Justice, Denver, Colorado, and Randall Cherry, Office of Regional Counsel,
Region 8, and Jonathan Skinner-Thompson, Office of General Counsel, United
States Environmental Protection Agency, with him on the brief) United States
Attorney's Office, Denver, Colorado, for Respondents.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Andrew
Wheeler is substituted for Scott Pruitt as the respondent in this case.

Before **TYMKOVICH**, Chief Judge, **SEYMOUR**, and **McHUGH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

This petition for review challenges the Environmental Protection Agency's 2016 decision to certify Colorado's compliance with air quality standards despite a number of days in which Colorado failed to meet those standards.

Robert Ukeiley is a local property owner who suffers from a lung condition worsened by airborne particulates. He spends substantial time at a residence near Lamar, Colorado, a town on Colorado's eastern plains. Like the rest of the high plains region, Lamar experiences many windy days, and the resulting dust storms generate airborne particulate pollution that affects its residents. Due to this pollution, between the early 1990s and 2005 the Environmental Protection Agency designated Lamar as a nonattainment area under the Clean Air Act.

To achieve attainment, Lamar needed to comply with National Ambient Air Quality Standards (Standards) promulgated by the EPA. The Standards impose a variety of regulatory requirements designed to reduce the exposure of the public to dangerous levels of airborne pollutants. To achieve compliance with the Standards, Colorado developed a state implementation plan in 1994. In 2002, Colorado requested the EPA to redesignate the Lamar area as an attainment area and submitted a ten-year maintenance plan to demonstrate expected compliance

through 2015.  The EPA approved the plan in 2005 and redesignated Lamar as an attainment area.

In 2013, as part of its requirement for achieving attainment, Colorado submitted its second proposed ten-year maintenance plan for the Lamar area. Along with its submission, Colorado asked the EPA to exclude a number of days in which Lamar's airborne pollutants exceeded the Standards.  The EPA concurred on the request for some of the days and approved the plan in 2016.

Ukeiley challenges that 2016 approval in his petition for review.  He contends the EPA abused its discretion by granting Colorado's request to exclude certain instances in which airborne dust exceeded the Standards.  As we explain, the EPA did not err in approving Colorado's maintenance plan.  The EPA's interpretation of the Clean Air Act and its application of that interpretation are correct.  And the EPA's regulations, related guidance, and the extensive administrative record all support the EPA's decision.  We therefore deny Ukeiley's petition for review.

## I.  Background

We start with an overview of the statutory and regulatory scheme.  We then discuss the specifics of Colorado's request to exclude some instances in which it failed to comply with the Standards and the EPA's rationale in granting the request.

## A. Clean Air Act

The Clean Air Act requires the EPA to establish National Ambient Air Quality Standards aimed at reducing airborne dust and soot particles in the air.

Pursuant to that statutory mandate, the EPA adopted Standards that set pollution limits for various air contaminants, including the pollutant at issue here—fugitive dust or soot particles known as "PM-10." PM-10's are "particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers." 42 U.S.C. § 7602(t). The Standards applicable here are based on the daily particulate amounts for a geographic area averaged over a longer period of time. *See* 71 Fed. Reg. 61,144 (Oct. 17, 2006). A geographic area meets the Standards if it averages one or fewer 24-hour periods of concentration above the limit per calendar year, averaged over a three-year period. *See* 40 C.F.R. 50.6 and 40 C.F.R. part 50, appendix K.

The Clean Air Act requires the EPA to designate any geographic location that does not meet this standard as a "nonattainment area." 42 U.S.C. § 7513(a). If the EPA designates a nonattainment area within a state, the state is required to submit a corrective plan that will ensure compliance with the air quality standards. 42 U.S.C. § 7513a(a)(2)(A). Once a state achieves compliance, it can request the EPA to redesignate the nonattainment geographic area. 42 U.S.C. § 7407(d)(3). To be eligible for redesignation, the state must submit a plan that describes how the state will maintain air quality compliance for ten or more years after the

-4-

redesignation. 42 U.S.C. § 7505a(a). And at the eight year mark after redesignation, the state must further revise its plan to demonstrate how it will maintain its air quality for an additional ten years following expiration of the initial ten-year maintenance period. 42 U.S.C. § 7505a(b).

### B. *Exceptional Events Rule*

The air quality standards are subject to certain exceptions under the Clean Air Act.

Section 7619 directs the EPA to promulgate "regulations governing the review and handling of air quality monitoring data influenced by *exceptional events*." 42 U.S.C. § 7619(b)(2) (emphasis added). Under § 7619(b)(1), an event is exceptional if it meets four statutory conditions: (1) it "affects air quality"; (2) it is not "reasonably controllable or preventable"; (3) it is "an event caused by human activity that is unlikely to recur at a particular location or a natural event"; and (4) the EPA has certified the exceptional event criteria have been met. 42 U.S.C. § 7619(b)(1)(A). If all of these conditions are met, the EPA may exclude certain air-quality monitoring data when determining whether or not a state complied with its implementation plan.

Consistent with its statutory mandate, the EPA has promulgated rules for administration of its exceptional events regime and specific guidelines as to what constitutes an exceptional event. Under the EPA's Exceptional Events Rule (Rule), "[a] State . . . may request the Administrator to exclude data showing

exceedances or violations of any national ambient air quality standard that are directly due to an exceptional event . . . ." 40 C.F.R. 50.14(a)(1)(ii).

In defining "exceptional event," the Rule largely tracks the statutory definition:

> *Exceptional event* means an event(s) and its resulting emissions that affect air quality in such a way that there exists a clear causal relationship between the specific event(s) and the monitored exceedance(s) or violation(s), is not reasonably controllable or preventable, is an event(s) *caused by human activity that is unlikely to recur at a particular location or a natural event(s).*

40 C.F.R 50.1(j) (second emphasis added).

In addition, the EPA defines "natural event":

> *Natural event* means an event and its resulting emissions, which *may recur at the same location, in which human activity plays little or no direct causal role.* For purposes of the definition of a natural event, anthropogenic sources that are reasonably controlled shall be considered to not play a direct role in causing emissions.

40 C.F.R 50.1(k) (second emphasis added).

The Rule's definitions crystalize a basic foundation for the contours of exceptional events. To supplement these definitions, the EPA has also issued detailed technical guidance for exceptional events in various circumstances such as high wind events.

## C. High Wind Guidance

The EPA issued guidance for applying the Rule to high wind events, such as those that generate fugitive dust. *See* Treatment of Data Influenced by Exceptional Events, 72 Fed. Reg. 13,560 (Mar. 22, 2007). In particular, the guidance instructs that for a state to be eligible for an exclusion, it must meet a number of technical elements. These elements include a showing that the high wind event (1) was not reasonably controllable; (2) caused the attainment area to be out of compliance with the standards; (3) was a natural event; and (4) was in excess of natural historical fluctuations.[1]

---

[1] <u>Elements for the Technical Demonstration of High Wind Dust Events</u>
- Air agencies' demonstrations must address the following six technical elements under the EER before the EPA can concur on a high wind dust event demonstration:
  1. whether the event was not reasonably controllable or preventable (nRCP)
  2. whether there was a clear causal relationship (CCR)
  3. whether there would have been no exceedance or violation but for the event (NEBF)
  4. whether the event affects air quality (AAQ)
  5. *whether the event was caused by human activity unlikely to recur or was a natural event (HAURL / Natural Event)*
  6. *whether the event was in excess of normal historical fluctuations (HF)*

R., Vol. 3 at 1960 (EPA, *Interim Guidance on the Preparation of Demonstrations in Support of Requests to Exclude Ambient Air Quality Data Affected by High*
(continued...)

As with the Exceptional Events Rule, the guidance tracks the statutory language concerning the frequency of exceptional events. The EPA requires exceptional events attributable to human activity be "unlikely to recur," but it permits recurring "natural event[s]." R., Vol. 3 at 1960. "The EPA acknowledges that natural events, such as high wind dust events, can recur and still be eligible for exclusion under the [Rule]. Therefore, events do not necessarily have to be rare to satisfy this element." *Id.* at 1978. But the EPA guidance still requires all exceptional events, including natural events, to be outside "normal historical fluctuations." *Id.* To determine whether an event is in excess of historical fluctuations, the EPA uses a "weight-of-evidence approach." *Id.* In this approach, no absolute numerical value or percentile of the event's relative rarity will guarantee a successful demonstration that the event was in fact outside normal historical fluctuations. Instead, the EPA uses a holistic methodology looking to factors such as meteorological and soil conditions, in addition to statistical data about the event's frequency.

### D. *Colorado's Compliance with the Standards*

In 1991, the EPA designated Lamar as a nonattainment area. 56 Fed. Reg. 56,735 (Nov. 6, 1991). As a result, Colorado was required to develop and institute

---

[1](...continued)
*Winds Under the Exceptional Events Rule* (May 2013)) (emphasis added).

a State Implementation Plan, which the EPA approved in 1994. In 2005, the EPA redesignated the Lamar area as attainment and approved Colorado's ten-year maintenance plan. In 2013, Colorado submitted a revised ten-year PM-10 maintenance plan to the EPA that would ensure attainment through 2025.

For approval of its revised maintenance plan, Colorado had to show that it was in compliance with the Standards. As explained above, that meant demonstrating that the Lamar area did not exceed the applicable Standard for more than one-day-per-year on a rolling three-year average. Over the period between 2001 and 2015, the Lamar area experienced numerous exceedances of the Standard. Colorado asked that 55 of these exceedances be set aside as excludable high wind events.

In support of its request, Colorado submitted meteorological analysis for each of these events to show there would have been no exceedance but for the high wind event. The analysis included comparisons to historical wind fluctuations and other information suggesting the winds were aberrational on these occasions—even though high winds might be expected with some level of frequency in the area.

### E. The EPA's Decision and Rationale

The EPA granted Colorado's request for 34 of the 55 flagged exceedances. It found Colorado adequately showed each of the 34 events met the criteria listed in the guidance for high wind exceptional events: each event was not reasonably

controllable or preventable; a causal relationship existed between correlation data and wind speeds; reasonable controls were implemented and enforced; the wind speed was high enough to overwhelm the controls; the event was outside historical fluctuations; and it was a natural event.

After examining the data and making an initial determination that it would exclude the exceedances, the EPA solicited public comments on its proposed decision. After receiving only one comment, the EPA issued a final rule that approved Colorado's plan revision for PM-10 and excluded the 34 exceedances on the basis that these were exceptional events.

## II. Analysis

Ukeiley claims the EPA wrongfully categorized these 34 exceedances where air quality exceeded the maximum PM-10 standard. He argues the exclusion criteria were not met because windy days in Lamar are common occurrences, therefore meeting neither the statutory nor the regulatory definitions for exceptional events. As a result, he contends the EPA arbitrarily and capriciously applied the exceptional events standard found in the Clean Air Act.[2]

---

[2] The EPA argues Ukeiley's challenge is untimely. In the EPA's view, Ukeiley is arguing that the EPA should have included an additional factor of "rarity" when classifying an exceptional event. In short, the EPA claims Ukeiley is challenging the Exceptional Events Rule itself, a challenge he should have brought when the Rule was promulgated in 2007.

We do not agree. Ukeiley specifically challenges the EPA's decision as
(continued...)

## A. *Standard of Review*

We review agency action under the Administrative Procedure Act. "The APA requires courts to consider agency action in conformity with the agency's statutory grant of power, and agency action is unlawful if it is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Sinclair Wyoming Ref. Co. v. EPA*, 887 F.3d 986, 990 (10th Cir. 2017) (citing 5 U.S.C. § 706(2)(C)).

Our APA review is limited. "Under the APA, we will not set aside agency action unless it is procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012) (internal quotation marks and citations omitted). "Agency action is arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Id.* (internal quotation marks and citations omitted). An agency's decision is likewise arbitrary if it "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal quotation marks and citations omitted). Accordingly, although our

---

[2](...continued)
inconsistent with "the statutory term 'exceptional event' and its regulatory definition." Pet. Br. at 8. This is a challenge to the decision and its statutory provenance, not to the Rule itself.

inquiry is "searching and careful," our "review is ultimately a narrow one." *Maier v. EPA*, 114 F.3d 1032, 1039 (10th Cir. 1997).

When reviewing agency action, we apply the familiar analytical framework set forth in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, we first consider if "Congress has directly spoken to the precise question at issue" and, if so, we apply the statute's plain meaning and the inquiry ends. *Sinclair*, 887 F.3d at 990 (quoting *Chevron*, 467 U.S. at 842–843). But "if the statute is silent or ambiguous about the question at issue" then "we defer to the authorized agency and apply the agency's construction so long as it is a reasonable interpretation of the statute." *Oklahoma v. EPA*, 723 F.3d 1201, 1207 (10th Cir. 2013). At the second *Chevron* step, we defer to administrative determinations on matters of technical evaluation and judgment. *See City of Albuquerque v. Browner*, 97 F.3d 415, 427 (10th Cir. 1996) ("We decline to second-guess the EPA's technical determination, which is entitled to substantial deference . . . .").

Our review here, therefore, starts with the definition of an exceptional event set forth by Congress in § 7619(b). If we find no ambiguity, our inquiry ends. If we find some ambiguity, we proceed to analyze the reasonableness of the EPA's interpretation of congressional intent as set forth in the Exceptional Events Rule. Finally, we ask whether the EPA's application of the Rule to Colorado's request was arbitrary or capricious.

### B. *Application of the Standard*s

Ukeiley first contends the EPA's exclusion of the high wind exceedances violates the plain meaning of 42 U.S.C. § 7619(b)(A)(iii). Specifically, he maintains the high *frequency and regularity* of these natural wind events does not make them "exceptional" under the statute. As he sees it, the "EPA can only exclude monitoring data that is *rare and exceeding the usual*," Pet. Br. at 32 (emphasis added), and he points to dictionary definitions for support. For instance, Black's Law Dictionary defines "exceptional" as "out of the ordinary"; and the Merriam-Webster Collegiate Dictionary defines "exceptional" as "forming an exception: rare." Pet. Br. at 32. Both definitions imply a limit on the frequency of any event, including a "natural event." Ukeiley therefore concludes that since windy days in the Lamar area happen frequently, they should not be eligible for exclusion as an exceptional event. Because the Exceptional Events Rule varies from his interpretation of the statute, Ukeiley argues the EPA's application of it here is arbitrary and capricious.

We disagree. "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). Here we find no ambiguity. In § 7619, "exceptional event" functions as a two-word term of art. In defining the term, Congress provided several guideposts for interpreting the phrase: these events must "affect air quality"; not be "reasonably controllable or preventable";

-13-

and be "an event caused by human activity that is unlikely to recur at a particular location *or* a natural event." 42 U.S.C. § 7619(b)(A) (emphasis added). Furthermore, Congress specifies what cannot be an exceptional event: "stagnation of air masses or meteorological inversions"; "a meteorological event involving high temperatures or lack of precipitation"; or "air pollution relating to source noncompliance." 42 U.S.C. § 7619(b)(B). These requirements served as a starting point for the EPA's rulemaking to further define the boundaries of exceptional events.

Of great importance here, the congressional definition makes a distinction between *human-caused* events and *natural* events. The EPA can only qualify a human-caused event as an exceptional event if it is unlikely to recur—meaning the event was a one-off that should have no long-term or recurring health-related consequences. For instance, human-induced recurring agricultural practices would not be eligible for exclusion as exceptional events. By contrast, the statute's definition does not include the same "unlikely to recur" limitation for natural events, such as high wind days. The import of this difference is clear: Congress did not exclude recurring natural variations from its definition of "exceptional event."

We therefore disagree with Ukeiley's interpretation of the statute and find the statute clear and unambiguous. And since the EPA's Rule complies with the

statute's plain meaning, we cannot find its application here arbitrary and capricious.

Additionally, both the Rule and the interim guidance outline factors for classifying exceptional events derived from the statute. Specifically, the EPA instructs state agencies seeking exclusions of exceedances to demonstrate that exceedances—including those resulting from natural events—are not reasonably controllable, that the high wind actually caused the exceedances, and that the events exceeded normal historical wind fluctuations. This methodology confirms high wind events that recur based on local conditions found on the Colorado plains can qualify as exceptional events as long as they meet certain criteria.[3]

Ukeiley further argues that even if the Rule and interim guidance reasonably interpret the statute, the EPA's decision was still arbitrary and capricious because it was based on faulty reasoning and insufficient evidence. But the record is clear that the EPA relied on considerable wind and meteorological data in reviewing Colorado's application for exclusion. Colorado supported its request for an exclusion with reams of technical data, in accordance with the Rule and the EPA's guidance. And for each set of exceedances excluded, the EPA examined multiple factors. For example, it looked at the percentile of the measurements based on location; whether any exceedances since 2005 were caused by events other than

---

[3] It follows that, even if we discerned some ambiguity, we would still uphold the EPA's decision as a reasonable construction of the statute.

-15-

high winds from distant areas carrying PM-10 dust; soil conditions; and meteorological conditions. *See, e.g.*, R., Vol. 3 at 599, 860, 1060, 1161, 1407, 1692, 1874. Its decision thus relied on technical judgments grounded in data—not in arbitrariness or caprice.

We conclude that in both promulgating the Rule and applying it, the EPA's actions were not arbitrary or capricious.

## III. Conclusion

Socrates is said to have observed, "the same wind is blowing, and yet one of us may be cold and the other not." The Dialogues of Plato 517 (Benjamin Jowett, trans., Encyclopedia Brittanica 1952). For the winds of Lamar, Ukeiley hopes his personal interpretation of "exceptional" will override Congress's statutory definition and the EPA's reasonable application of it. But we are bound by law and reasonable decisions applying it. Therefore, we **DENY** the petition.